UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JDI HOLDINGS, LLC,

      Plaintiff,

v.                          CASE NO.: 3:07cv242/MCR/EMT

JET MANAGEMENT INC.,
SOUTHERN JET CENTER LLC,
JON KERR, and
METRO CAPITAL PARTNERS, LLC,

      Defendants.[1]
_____/

**O R D E R**

      This law suit stems from Plaintiff, JDI Holdings, LLC's purchase of an aircraft from Defendants Jet Management, Inc. and Southern Jet Center, LLC in December 2005. Defendant Jon Kerr is an aircraft broker retained by JDI to assist with the purchase process. JDI claims that during the time Kerr was acting as its agent he entered into a separate, secret agreement with Jet and Southern which compromised his loyalties to JDI and led to JDI unknowingly purchasing a plane with significant defects. JDI seeks damages and the rescission of the purchase agreement. Now pending are JDI's motion for partial summary judgment on liability and Jet and Southern's motion for summary judgment on all claims.

**Facts and procedural history**

      JDI's chief executive and sole member is Jared Isaacman. In 2005, Isaacman

---

[1] Plaintiff's initial complaint also named Cessna Aircraft Company as a defendant. Cessna, however, was dismissed by stipulation on March 12, 2008, and is no longer a party to this case. On February 26, 2009, the court granted Metro Capital Partners, LLC's motion to dismiss for lack of personal jurisdiction.

sought to purchase a used mid-cabin jet for JDI. In November 2005, Isaacman contacted Kerr to find a plane and also to assist with the purchase. Kerr used his contacts in the private aircraft industry to identify several planes for Isaacman's consideration. Kerr found the aircraft at issue, a Cessna Citation III, at Southern.[2]

Isaacman was interested in the plane and asked Kerr to obtain further details. On December 1, 2005, Kerr forwarded Southern's specifications sheet for the plane to Isaacman. Finding the aircraft acceptable, Isaacman asked his attorney to prepare a purchase contract. The contract was to be made between JDI as the purchaser and Jet as the seller.[3] The contract required an initial deposit from JDI, to be held in escrow, following which Jet would permit JDI to conduct a pre-purchase inspection. The parties understood that for this inspection Jet would deliver the aircraft to the Cessna Service Center in Orlando, the maintenance depot of the plane's manufacturer, Cessna Aircraft Company. The parties further understood that Cessna would conduct an inspection of the plane, in accordance with Isaacman's directions, and prepare an inspection report. Except in the event Jet refused to complete the deal, JDI was responsible for the inspection costs. The contract further contemplated that upon review of the inspection report, JDI could ask Jet to repair any "airworthiness" problems at Jet's expense or terminate the contract.[4] Jet would then have the option to decide whether or not to make the repairs; if not, JDI would be entitled to the return of its deposit. Closing was expected to occur soon after the

---

[2] Southern had previously acquired the plane as part of its purchase of six Citations from another company. Upon acquiring these planes, and before receiving Kerr's inquiry, Southern performed an inspection on the planes, which the parties refer to as a "Phase 1–5 inspection." Phase 1–5 is the name given to a comprehensive inspection and repair process undertaken by FAA-licensed inspectors and aircraft mechanics. After a successful Phase 1–5 inspection, the FAA will issue or renew a plane's certificate of airworthiness, which is required for normal flight operation.

[3] The final agreement was between Jet Management, Inc. as the seller and "United Bank Card, Inc. or its nominee" as the buyer. The record shows that JDI Holdings, LLC assumed the rights of United Bank Card, Inc. under this contract.

[4] The contract does not define the term "airworthiness."

Delivery Date,[5] at which time JDI would be required to execute a delivery acceptance form and tender the balance of the purchase price through the escrow agent.[6]  In return, Jet would deliver an FAA Bill of Sale, other related documents, and the aircraft.

The purchase contract was signed on December 5, 2005, and the parties promptly undertook the contemplated actions.  JDI claims, however, that at this time it was unaware of a second contract, a secret "Finder's Fee Agreement," made between Kerr, Jet, and Southern on or about November 29, 2005, under which Jet and Southern agreed to pay Kerr a commission if Kerr was successful in convincing JDI to purchase the aircraft from Jet.[7]  The commission was to be calculated as $150,000 minus the costs of any repairs Jet had to make pursuant to the purchase contract.  JDI maintains Kerr, by entering into the secret finder's fee agreement, knowingly accepted a conflict of interest and breached his fiduciary duty to JDI, because Kerr had a financial incentive to minimize the amount of repairs Jet would have to pay for so as to maximize his own commission, which in turn compromised his duty to act in JDI's best interest in regards to the inspection.  JDI also claims that Jet and Southern, by entering into the secret agreement with Kerr knowing it was to JDI's disadvantage, tortiously interfered with the relationship between Isaacman and Kerr.  JDI denies having had any knowledge of this finder's fee arrangement between Kerr, Jet, and Southern before closing on the aircraft, and the record does not suggest otherwise.

According to JDI, proof of the secret finder's fee agreement is reflected in a pair of e-mails from Paul Watkins to Kerr.  The first, sent on November 29, 2005, reads in part:[8]

> "the amount paid as a finders fee is a net price to [Jet] of 3050m, the purchase price is 3.2m minus the bill at Cessna . . . for mutually agreed to

---

[5]  The contract defined the "Delivery Date" as the day on which the repairs on the plane were complete.

[6]  The contract mentioned other delivery criteria not relevant here.

[7]  Jet and Southern concede that this agreement was made; there is no written agreement in the record, however.

[8]  The subject line for this email is "FINDERS FEE AGREEMENT."

CASE NO.: 3:07cv242/MCR/EMT

Page 4 of 14


Page 4 of 14

> airworthiness discrepancies fixed by Cessna . . . . The remaining amount at closing difference between the 3.2m contract price and the 3050m net price to [Jet] will go to Jon Kerr out of escrow at closing."

A second e-mail, dated December 10, 2005, states:

> "If Cessna gives us [airworthiness discrepancy] list Monday, deposit goes hard, Cessna fixes plane, wire the funds to pay for plane to escrow 3.2m, pay bill at Cessna, fly plane to Wilmington, release funds to pay for plane, 3050m to us, rest to you after Cessna bill is paid, oh to be you, then fly plane to Allentown if you want, will need credit card for delivery expenses when time comes and shes a done deal, does this sound ok?"

JDI also points to Watkins' deposition testimony in which Watkins acknowledges that he and Kerr discussed the costs of the repairs. According to Watkins, Kerr "hoped the bill would be low, and cried and whined along the way for anything that had to be fixed on the airplane, because that would affect how much money he received." (Watkins Dep., Vol. II, at 40:23–41:1.) In another e-mail from Kerr to Watkins, dated December 16, 2005, Kerr states, "Paul--I just spoke to Chuck at Cessna and I am not happy. This is not working out the way I thought it would. I'm hearing the bill will be over $50,000!" (Watkins Dep., Vol. I, Ex. 13.)

JDI believes Kerr's conflict of interest immediately colored his view of the transaction and compromised his fiduciary duty to JDI. According to JDI, although Cessna always recommends a full Phase 1–5 inspection to its customers, in this case Kerr repeatedly recommended to Isaacman that JDI decline this recommendation and instead have only a limited Aircraft Survey performed.[9] Kerr also told Cessna that the Aircraft Survey was all that should be performed. Although the evidence suggests Kerr partly based this recommendation on the fact that Southern had just performed its own Phase 1–5 inspection prior to offering the plane for sale, the evidence also supports JDI's position that Kerr sought a limited survey in order to minimize the potential number of problems Cessna would find with the plane which would in turn impact his commission from Jet.

Cessna conducted the limited inspection in early December, with Kerr acting as

---

[9] Cessna offers at least two levels of aircraft inspection: a full Phase 1–5 inspection and a more limited "Aircraft Survey" inspection.

JDI's designated contact with Cessna. On December 8, 2005, Cessna provided Kerr with its inspection report, also known as a discrepancy report, which Kerr forwarded to Isaacman. Some of the problems noted were merely cosmetic, while others arguably affected the plane's airworthiness. Under the purchase agreement, Jet was required to correct only airworthiness issues. From the report, Jet and JDI created a list of "airworthiness" concerns and on December 12, 2005, Isaacman e-mailed Kerr to "green light the work," stating, "I want to make sure everything on that report from Cessna is fixed." Cessna then began repairs on these items. JDI maintains, however, that Kerr did not share Isaacman's desire to have all maintenance issues corrected. Unbeknownst to Isaacman at the time, after receiving the December 8, 2005, discrepancy report, Kerr e-mailed Watkins and asked him to call Cessna about it; JDI suspects this was because there were too many items on the list. When Watkins agreed, Kerr replied to say, "thanks--beat the crap out of him!" According to JDI, this is evidence of Kerr's intent and effort to hold down repair costs so as to maximize his own profit under his finder's fee agreement with Jet.

JDI also claims that Kerr used his position as the middleman between JDI and Cessna to hide material information from JDI. Apparently, while performing repairs, Cessna found additional problems with the plane and generated at least two other discrepancy reports.[10] According to JDI, Kerr did not provide Isaacman or his attorney with any report other than the initial December 8, 2005, report; however, Kerr did provide the other reports to Jet and Southern and coordinated with them as to repairs they would be willing to make. Jet and Southern dispute that they hid any reports, and claim that Cessna sent at least two reports to JDI's attorney. The record contains no evidence of this, however. JDI insists that if Kerr had provided the additional discrepancy reports to

---

[10] The record contains discrepancy reports bearing the dates December 8, 2005; December 13, 2005; December 16, 2005; and December 28, 2005. The exact number of reports generated by Cessna, as well as the additional nature of the communications among Cessna, Kerr, Jet, and Southern regarding the repairs is unclear from the record. The December 16, 2005, report lists numerous discrepancies along with handwritten annotations as to whether items would be approved or disapproved for repair. Some of these annotations reference Paul Watkins as the approver.

CASE NO.: 3:07cv242/MCR/EMT

Isaacman and Isaacman had known the true condition of the jet, he would have either insisted upon the repair of the items noted on the reports or withdrawn JDI from the transaction entirely, pursuant to the purchase contract. Instead, according to JDI, Kerr covered up the additional problems found during the limited inspection process, e-mailing Isaacman and his attorney on December 14, 2005, to say: "Everything is going very well with the Citation III. Paul Watkins authorized all the work. . . . Cessna has been very thorough with the inspection."[11]

On December 29, 2005, the purchase of the aircraft closed, and JDI paid Jet $3,200,000. Of this amount, Jet retained $3,050,000, and made a payment of $78,686.61 to Cessna for repairs, and $71,313.39 to Kerr—exactly $150,000 minus the total cost of repairs. Additionally, JDI paid a $70,000 commission to Kerr for his services. Immediately after the closing, JDI took possession of the aircraft, and Isaacman flew the plane to Atlantic City and later to California. Although JDI concedes that the plane functioned normally on these trips, it maintains the plane nonetheless had significant defects which rendered it unsafe to fly and thus not airworthy. Shortly after the Atlantic City and California trips, Isaacman took the plane to New World Aviation in Allentown, Pennsylvania, where mechanics generated a new discrepancy list of forty-six items needing correction. One mechanic at New World, James MacConnell, contacted the Cessna Service Center in Orlando and requested information on the defects found there during the pre-sale limited survey.[12] In response, Cessna faxed MacConnell the reports which JDI claims it never previously received. These reports disclose many additional problems not identified on the December 8, 2005, report, the only report JDI acknowledges receiving prior to closing. According to MacConnell, several of the items on the list were

---

[11] A jury could reasonably infer that this e-mail is further evidence of a coverup in light of a second Cessna report issued the previous day, December 13, 2005, which contained new discrepancy items not present on the first report of December 8, 2005. Given that Isaacman had previously told Kerr he wanted "to make sure everything on that [first] report from Cessna is fixed," a jury could reasonably infer that Isaacman would have wanted Cessna to correct all items noted on the December 13 report as well and thus could find that Kerr misled Isaacman into thinking there were no problems when in fact additional problems had been discovered and noted.

[12] James MacConnell is presently JDI's expert witness.

safety issues related to the plane's airworthiness.[13]  As a result, New World had to request a special "ferry permit" from the FAA so the plane could be flown to the Cessna Service Center in Newburgh, New York.[14]  There, mechanics conducted extensive repairs on the plane which JDI claims put the plane out of service for six months.[15]

On June 6, 2007, JDI filed its initial complaint against Cessna, Jet, and Southern. JDI subsequently settled with Cessna and dropped it from the suit.  On April 17, 2008, JDI amended its complaint to add Kerr individually and Kerr's company Metro Capital Partners, LLC (known as "Metro"); the new complaint contains nine counts against Jet, Southern, Kerr, and Metro.  On February 26, 2009, the court granted Metro's motion to dismiss but denied Kerr's motion to dismiss.  Thus, the remaining claims are:

- Count I against Jet for breach of contract
- Count II against Jet and Southern for tortious interference
- Count III against Southern for negligence
- Count IV against Kerr for breach of fiduciary duty
- Count V against Kerr for fraud
- Count VI against Kerr for unjust enrichment
- Count VII against Jet and Southern for conspiracy
- Count VIII against Jet, Southern, and Kerr for violation of the Florida Deceptive and Unfair Trade Practices Act
- Count IX against Jet for rescission

JDI has moved for partial summary judgment on liability only, seeking a ruling from the court that the purchase agreement is voidable at its election.  Jet and Southern have moved for summary judgment on all counts against them.

**Standard of review**

A motion for summary judgment should be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine

---

[13] For instance, there was an unrepaired loose flap handle cover which MacConnell says could have caused problems with deployment of the landing flaps needed to successfully land the plane, and a broken connector on the co-pilot's side window which interfered with the de-icing capability on that side of the plane. Other items identified potential problems with the rudder and elevators.

[14] JDI claims that without the special "ferry permit" the plane could not legally be operated in flight.

[15] The court understands that JDI continues to own the plane, but it is not clear from the record whether the plane is airworthy or currently in use.

issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A factual dispute is "'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed. 2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing [substantive] law." *Anderson*, 477 U.S. at 248; *Tipton v. Bergrohr GmbH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citation omitted). Nevertheless, a general denial unaccompanied by any evidentiary support will not suffice. Fed. R. Civ. P. 56(e)(2); *see, e.g., Courson v. McMillian*, 939 F.2d 1479 (11th Cir. 1991); *Hutton v. Strickland*, 919 F.2d 1531 (11th Cir. 1991). Furthermore, the court is not obliged to deny summary judgment for the moving party when the evidence favoring the nonmoving party is merely colorable or is not significantly probative. *See Anderson*, 477 U.S. at 249. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. Indeed, the existence of a scintilla of evidence in support of the nonmovant's position is insufficient; the test is "whether there is [evidence] upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." *Id.* at 252. The moving party has the initial burden of showing the absence of a genuine issue as to any material fact. *See Adickes,* 398 U.S. at 157; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). Once the movant satisfies its burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmovant to "come forward with 'specific facts showing that there is a genuine issue for

trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (emphasis omitted). Otherwise stated, the nonmovant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

### JDI's motion for partial summary judgment

JDI moves for partial summary judgment on the purchase agreement, arguing that because Kerr was a secret dual agent—an agent of both JDI and of Jet and Southern—the contract is voidable. JDI's motion is denied because there are disputed issues of fact as to whether Kerr was an agent of Jet and Southern during the same time he was acting as JDI's agent.[16]

When a third party interferes with the agent of another, creating a secret dual agency arrangement, disgorgement of secret profits and/or rescission are permissible remedies. *Martin Co. v. Commercial Props., Inc.*, 213 So.2d 477, 480 (Fla. 4th DCA 1968) (secret profits); *Phillips Chem. Co. v. Morgan*, 440 So.2d 1292, 1293 (Fla. 3d DCA 1983) (secret profits and rescission); *ITT Cmty. Dev. Corp. v. Barton*, 457 F. Supp. 224 (M.D. Fla. 1978) (secret profits); *Taborsky v. Mathews*, 121 So.2d 61, 62 (Fla. 2d DCA 1960); *see also Berg v. Capo*, 994 So.2d 322, 327–28 (Fla. 3d DCA 2007) (Rothenberg, J., dissenting) (surveying dual agency cases). Further, a broker or buyer's agent owes a duty of loyalty to his principal to act with "'*fairness, promptness and completeness* concerning all facts within his knowledge which are, or may be, material to the situation in connection with his employment.'" *Frey v. Fraser Yachts*, 29 F.3d 1153 (7th Cir. 1994) (citing *Kline v. Pyms Suchman Real Estate Co.*, 303 So.2d 401, 404 (Fla. 3d DCA 1974)) (emphasis in original) (applying Florida law and holding that yacht broker had duty to disclose his agency

---

[16] Kerr disputes he was an agent of JDI or Isaacman. This specific issue, however, has not been raised by the parties in the present motions, and thus is not directly before the court and need not now be decided. Nonetheless, the court notes there is strong support in the record for finding an agency relationship between JDI and/or Isaacman and Kerr. For example, Kerr agreed to perform and actually did perform the tasks of locating a suitable aircraft, recommending the type of inspection, overseeing that inspection, and acting as JDI's contact person for Cessna, and for these tasks he accepted a $70,000 payment from JDI. The court will assume for purposes of this order only that Kerr was the agent of JDI and/or Isaacman in connection with the purchase process, including oversight of the pre-sale inspection.

relationship with buyers to the seller).

The undisputed evidence shows that Kerr, Jet, and Southern entered into a finder's fee agreement during the time Kerr presumably was acting as JDI's agent. JDI also claims that Jet and Southern kept the agreement a secret. Jet and Southern have presented no evidence to the contrary; there is no evidence that, before the sale of the aircraft closed, JDI or Isaacman was told about the agreement, otherwise became aware of it, or consented to Kerr's entering into the agreement. Notwithstanding the existence of the secret agreement, however, in order to prevail on its dual agency claim JDI must prove that Kerr was the agent of Jet and Southern at the same time he was JDI's agent. This requires a showing of control by Jet and Southern over Kerr's actions in furtherance of their objectives. *See Goldschmidt v. Holman*, 571 So.2d 422, 424, n.5 (Fla. 1990) (affirming court's finding of no control and thus no agency). Whether Jet and Southern had sufficient control over Kerr cannot be decided on this record and, therefore, JDI's motion for partial summary judgment as to liability, which is premised entirely on the argument that Kerr was a dual agent, will be denied.

**Jet and Southern's motion for summary judgment**

Jet and Southern move for summary judgment on all six counts against them.

<u>Count I — Breach of Contract</u>

JDI argues that Jet's interference with the pre-sale inspection contemplated in the purchase agreement constituted a breach of contract. In response, Jet states that it complied with the purchase agreement to the letter, and thus there was no breach of contract. Jet stresses that "<u>at closing</u> all the seller has to give is clear title and an airplane that is the same as it was at the start of the process." (Jet's Mot. for Summ. J., doc. 111, at 8.) Because Jet afforded JDI the right to choose the manner of inspection of the aircraft, it argues, JDI had a fair and reasonable opportunity to uncover any airworthiness defects and bring them to Jet's attention. Jet also relies on the purchase agreement's express disclaimer of any warranties and insists that any obligation to repair the aircraft did not survive the closing. JDI charges that Jet's interference with the inspection process rendered its fair opportunity to inspect a sham and constituted a breach of the agreement,

and notes that it specifically insisted on the pre-sale inspection during contract negotiations. JDI argues that Jet and Southern knew the secret finder's fee agreement they made with Kerr would compromise his loyalties to JDI because they gave him a financial incentive he otherwise would not have had to minimize the number and significance of repairs, which naturally compromised his duty to JDI to oversee the inspection process with its best interest in mind.[17] JDI points to evidence that Paul Watkins of Jet accepted Kerr's invitation to "beat the crap out of" Cessna about identified maintenance issues, which if true would constitute Jet's active interference with JDI's pre-sale inspection.

Where a pre-sale inspection is a condition precedent to a sales agreement, even an agreement subject to a bill of sale involving "as is" terminology, the seller's interference with the inspection process can give rise to liability. *See Inter-Tel, Inc. v. West Coast Aircraft Eng'g, Inc.*, No. 8:04-CV-2224, 2006 WL 3335014, at *9–11 (M.D. Fla. Nov. 16, 2006) ("*Inter-Tel I*"). JDI has introduced sufficient evidence to create a genuine dispute of material fact as to Jet's interference with the pre-sale inspection process, and thus Jet's motion for summary judgment on Count I will be denied.

Count II — Tortious Interference

JDI claims that by entering into the finder's fee agreement with Kerr, Jet and Southern intentionally interfered with the existing relationship between JDI and Kerr. Jet and Southern's sole argument in response is that JDI has presented no evidence of injury arising from any alleged interference, a necessary element of this claim. *See Linafelt v. Bev, Inc.*, 662 So.2d 986, 989 (Fla. 1st DCA 1995). The court disagrees. JDI has introduced sufficient evidence from which it may be inferred that JDI would have either

---

[17] JDI claims that because Kerr stood to collect whatever portion of the $150,000 was not spent on repairs, Kerr no longer oversaw the aircraft inspection with the same vigor as he would have otherwise. This is plausible from the facts. Moreover, Jet arguably benefitted from Kerr's assistance in minimizing the cost of repairs. Although Kerr's commission was calculated as $150,000 minus the cost of repairs, this figure merely set a floor on the amount Jet would have to pay out to complete the transaction. Under the contract with JDI, had repair costs been any higher than $150,000, Jet would have had to pay that full amount to Cessna (leaving nothing for Kerr) or lose the entire deal. Thus, Jet arguably used Kerr to see to it that JDI went through with purchasing the plane and to keep the repair costs under $150,000, both of which directly benefitted Jet.

CASE NO.: 3:07cv242/MCR/EMT

uncovered additional maintenance problems requiring correction or elected not to purchase the jet at all, were it not for Jet and Southern's finder's fee agreement with Kerr. The record also shows that Jet and Southern agreed to contact Cessna and dispute the items on the discrepancy list in an effort to reduce the amount of necessary pre-sale maintenance on the plane. Defendants' motion for summary judgment on Count II will be denied.

Count III — Negligence

JDI claims the Phase 1–5 inspection Southern conducted before JDI became interested in the plane was negligently performed, and Southern knew or should have known that JDI would rely on the results of the inspection in its decision to purchase the plane. Southern argues "there is no evidence upon which to base a negligent performance of the inspection claim," and thus summary judgment must be granted in its favor. JDI responds, however, that the maintenance problems discovered after it acquired the jet should have been detected during a proper Phase 1–5 inspection, and it offers expert mechanic testimony to that effect. JDI also maintains that it relied on the Phase 1–5 inspection in rejecting Cessna's recommendation for a full Phase 1–5 inspection. This is sufficient to create an issue of material fact, and summary judgment on Count III for Southern will be denied.

Count VIII — Florida Deceptive and Unfair Trade Practices Act

JDI claims the secret finder's fee agreement constituted a violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. §§ 501.201, *et seq.* The FDUTPA "create[s] a simplified statutory cause of action which bestows additional substantive remedies . . . to recover economic damages related solely to a product or service purchased in a consumer transaction infected with unfair or deceptive trade practices or acts." *Delgado v. J.W. Courtesy Pontiac GMC-Truck, Inc.*, 693 So.2d 602, 606 (Fla. 2d DCA 1997). For a consumer to prevail on a claim under the FDUTPA, he must establish: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Rollins, Inc. v. Butland*, 951 So.2d 860, 869 (Fla. 2d DCA 2006); *Gentry v. Harborage Cottages-Stuart, LLLP*, ____ F. Supp.2d ____, 2009 WL 689714 (S.D. Fla. 2009). A

deceptive act is an act likely to mislead consumers.[18]  *Davis v. Powertel, Inc.*, 776 So.2d 971, 974 (Fla. 1st DCA 2000).  An unfair practice is "one that 'offends established public policy' and is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'"  *PNR, Inc. v. Beacon Property Management, Inc.*, 842 So.2d 773, 777 (Fla. 2003).  It is not necessary, however, to show an established pattern of deception on the part of the seller; instead, a single party, transaction, or contract may suffice.  *Id*.

For the reasons stated on the claims previously discussed, JDI has come forward with sufficient evidence of causation and actual damages to survive summary judgment on its FDUPTA claim.  On the question of whether Jet and Southern engaged in a "deceptive act or unfair practice" under the FDUPTA, the court notes that in certain circumstances an undisclosed dual agency relationship may constitute a deceptive act or unfair practice under the act.  *See Inter-Tel, Inc. v. West Coast Aircraft Eng'g, Inc.*, No. 8:04-CV-2224, 2006 WL 3335050, at *9, *7–8 (M.D. Fla. Nov. 16, 2006) ("*Inter-Tel II*").  Additionally, Florida common law generally recognizes that an undisclosed dual agency relationship can constitute an unfair practice.  *Cf. Phillips Chem. Co.*, 440 So.2d at 1293, 1296 (breach of employee's fiduciary duties); *Young v. Field*, 548 So.2d 784, 786 (Fla. 4th DCA 1989) (breach of broker's fiduciary relationship) ("Neither may a broker act as agent for both the seller and the purchaser in the same transaction unless both the seller and the purchaser know of such dual representation and agree to it.").  On this record, sufficient questions of fact remain as to whether the finder's fee agreement was a deceptive act or unfair practice under the FDUPTA.  Defendants' motion for summary judgment on Count VIII will be denied.

Count VII — Conspiracy

JDI claims Jet and Southern conspired with Kerr to enter into the finder's fee agreement and, in so doing, assisted Kerr in breaching his fiduciary duties and perpetrating fraud on JDI.  This claim rests on the same arguments made in connection with JDI's tortious interference and breach of contract claims.  "Generally an actionable conspiracy

---

[18] There is no requirement to show reliance, however.  *Davis v. Powertel, Inc.*, 776 So.2d 971, 974 (Fla. 1st DCA 2000).

CASE NO.: 3:07cv242/MCR/EMT

requires an actionable underlying tort or wrong." *Walters v. Blankenship*, 931 So.2d 137, 140 (Fla. 5th DCA 2006).  Because summary judgment is inappropriate on the underlying claims, it is likewise inappropriate on the conspiracy claim.

<u>Count IX — Rescission</u>

Having previously determined that rescission is a possible remedy on JDI's claims, the court declines to grant summary judgment on Count IX.

Accordingly, it is hereby ORDERED that:

1.	JDI Holdings LLC's motion for partial summary judgment (doc. 132) is DENIED.

2.	Jet Management Inc. and Southern Jet Center, LLC's motion for summary judgment (doc. 111) is DENIED.

3.	JDI Holdings LLC's motion for extension of time (doc. 116) is DENIED as moot.

4.	This case will be set for trial by separate order of the court.

**DONE and ORDERED** this 31st day of March, 2009.

　　　　　　　　　　　　　　　　　*s/ M. Casey Rodgers*
　　　　　　　　　　　　　　　**M. CASEY RODGERS**
　　　　　　　　　　　　　　　**UNITED STATES DISTRICT JUDGE**