**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**


**JDI HOLDINGS, LLC,**

                 **Plaintiff,**

**v.**                                                    **Case No.: 3:07cv242/MCR/EMT**

**JET MANAGEMENT, INC.;
SOUTHERN JET CENTER, LLC;
and JON KERR,**

                 **Defendants.**

_____/

## O R D E R

        This case was tried before the court without a jury.  The dispute involves several claims arising out of the purchase of an aircraft in December 2005 by Plaintiff JDI Holdings, LLC ("JDI").[1]  See 28 U.S.C. § 1332.  JDI asserts that the aircraft seller, Jet Management, Inc. ("Jet") breached the aircraft purchase agreement by delivering the aircraft with significant defects.  JDI maintains that Jet and its affiliated repair and maintenance facility, Southern Jet Center, LLC ("Southern"), conspired together with Jon Kerr ("Kerr"), an aircraft broker hired by JDI, to minimize and conceal defects in the aircraft, thereby causing JDI to purchase an aircraft with significant defects.[2]  JDI also claims that Jet and Southern intentionally interfered with its relationship with Kerr and that Kerr entered into a dual agency relationship with both JDI and Jet.  JDI seeks damages from all defendants, rescission of the purchase agreement, and disgorgement of Kerr's commission.

---

        [1]  The court has diversity jurisdiction over the dispute pursuant to 28 U.S.C. § 1332.  JDI is a limited liability company existing under the laws of New Jersey and with its principal place of business in New Jersey; Defendant Jet Management, Inc., is a Florida corporation with its principal place of business in Florida; Defendant Southern Jet Center, LLC, is an affiliate of Jet and a Florida limited liability company; and Defendant Jon Kerr is a resident of Connecticut.  There is no dispute that the amount in controversy exceeds $75,000, venue in this court is proper, and Florida law applies.

        [2]  Plaintiff's initial complaint also named as a defendant Cessna Aircraft Company, which was dismissed from the case by stipulation of the parties (doc. 74), and Metro Capital Partners, LLC, which the court dismissed for lack of personal jurisdiction (doc. 190).

**Rule 52 Standards**

At trial, following the close of the plaintiff's evidence, Jet and Southern moved for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c), arguing that JDI had failed to set forth sufficient evidence to support its claims.  Rule 52(c) permits the court during a nonjury trial and after a party has been fully heard on an issue to enter judgment on a claim or defense that "can be maintained or defeated only with a favorable finding on that issue," and requires that any "judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a)."  Fed. R. Civ. P. 52(c).  When ruling on a Rule 52(c) motion, "the court must weigh the evidence and may consider the witnesses' credibility," treating the motion "as if it were a final adjudication at the end of trial," though it occurs in the middle.  *Caro-Galvan v. Curtis Richardson, Inc.*, 993 F.2d 1500, 1504 (11th Cir. 1993) (internal marks omitted).  Thus, the court resolves the disputed issues on the basis of the preponderance of the evidence, without drawing any special inferences in favor of the plaintiff.  *Emerson Elec. Co. v. Farmer*, 427 F.2d 1082, 1086 (5th Cir. 1970)[3] (discussing the former Rule 41(b)[4]).  The court retains discretion under Rule 52(c) to "decline to render any judgment until the close of the evidence."  The court declined to render judgment as to Jet until the close of evidence but granted Southern's Rule 52(c) mid-trial motion for judgment on partial findings, stating the relevant findings and conclusions of law on the record.  That ruling stands, and the court therefore will enter final judgment in favor of Southern for the reasons stated on the record at trial.

The court now considers the claims against the remaining parties, Jet and Kerr.  In rendering judgment following a nonjury trial, Rule 52(a) requires the district court to make specific findings of fact and to state conclusions separately.  The rule "does not require a

---

[3]  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[4]  Case law construing the former Rule 41(b) is equally applicable when construing Rule 52(c).  *See* 9C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2573.1, at 253 (3d ed. 2008).

finding on every contention raised by the parties," but requires the court to provide sufficient detail demonstrating that care was taken in ascertaining and analyzing the facts necessary to the decision and providing "sufficient particularity" to facilitate meaningful review. *Feazell v. Tropicana Prods., Inc.*, 819 F.2d 1036, 1042 (11th Cir. 1987). Thus, in accordance with the requirements of Rule 52(a), having heard and considered all of the testimony, evidence, and arguments presented at trial, the court now enters the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

Background

JDI, through its chief executive officer and sole member, Jared Isaacman,[5] purchased a 1984 Cessna Citation Model 650 jet aircraft[6] ("the Cessna Citation 650" or "the aircraft") from Jet on December 5, 2005. Isaacman, who is now a licensed pilot and seasoned aircraft owner, had never owned or flown a plane in 2005; this transaction was his first aircraft purchase. Isaacman testified that he became interested in purchasing an airplane in the fall of 2005, after his company experienced a "liquidity event," which made a large purchase prior to the end of the year desirable from a tax standpoint. Additionally, Isaacman wanted an aircraft for personal and business use and to earn business revenue as a certified charter aircraft pursuant to Part 135 of the Federal Aviation Regulations,[7] when not in use by Isaacman.

Isaacman was initially interested in an aircraft offered for sale by Jon Kerr. Emails confirm that Isaacman and Kerr were engaged in discussions related to that aircraft in

---

[5]  The purchase agreement lists the buyer as United Bank Card, Inc. or its nominee and is signed by Jared Isaacman as United Bank Card, Inc.'s chief executive officer.  Subsequently, on December 7, 2005, United Bank Card, Inc., assigned its rights under the purchase agreement to JDI.  The court, therefore, will refer to JDI as the purchaser under the agreement.

[6]  This aircraft bears the serial number 030 and Federal Aviation Administration (FAA) registration number N51EM.

[7]  JDI's expert, James MacConnell, chief inspector at New World Aviation, testified that an aircraft must undergo a special "Part 135-conformity inspection" prior to operating as a charter plane.  MacConnell described this as an ongoing inspection to assure the aircraft's safety and integrity as long as it is being used as a charter plane.

September 2005.  Although Isaacman's interest turned to different airplanes, he continued to rely on Kerr's assistance to identify a suitable aircraft for him to purchase.  In November 2005, Kerr identified the Cessna Citation 650 offered for sale by Jet, which suited Isaacman's needs.  The aircraft had recently undergone a Phase 1 - 5 inspection process at Southern.[8]   Kerr and Isaacman's attorney, Don Dulac, negotiated a $3.2 million purchase price with Paul Watkins, Vice President of Acquisitions for Jet.[9]

Aircraft Negotiations and Purchase Agreement[10]

There is no dispute that Jet and Southern knew that Kerr was representing JDI during the negotiations and pre-closing inspection and repair process.  (Doc. 245.)  Emails show that on November 21, 2005, Kerr informed Isaacman of the Cessna Citation 650 and informed Watkins, Jet's representative, that Isaacman was interested in it.  (Plaintiff's Ex. 19.)  The next day, November 22, Kerr sent an email informing Isaacman's attorney, Dulac, about this aircraft, and Kerr began arranging financing.

Email correspondence shows that within four days of identifying this aircraft, Kerr was discussing a fee arrangement with Watkins.  Kerr and Watkins both testified that aircraft brokers often have trouble getting paid so they attempt to obtain payment for themselves from either side.  Kerr had no written agency or broker agreement with Isaacman or JDI.  He testified that he was instructed to communicate with Isaacman's

---

[8]  As discussed at trial, a "Phase 1 - 5 inspection" is a comprehensive set of inspections and repair processes mandated by the FAA and performed by FAA-licensed inspectors and aircraft mechanics. According to plaintiff's expert James MacConnell, Phase 1 through 4 inspections, required every 24 months, involve "airframe inspection requirements determined by the aircraft manufacturer," and Phase 5 is "an extended inspection program" required every 36 months.  Certification that an aircraft has undergone a successful and recent Phase 1 - 5 inspection process ensures the integrity and airworthiness of the aircraft.

[9]  Jet is in the business of purchasing and selling aircraft.  The evidence shows that Arden Doss of Avion Sales, LLC, was a financial backer of Jet who provided financing for this Cessna Citation 650, which Jet purchased from Flight Options, another aircraft dealer, in July 2005.  Jet then deeded the title to Avion, delivered the plane to Southern for the Phase 1 - 5 inspection, and began searching for a buyer.  To close the deal, Avion deeded the aircraft to Jet, and Jet, in turn, deeded the aircraft to JDI.  Doss explained by deposition that there is a built-in incentive in this arrangement for Jet to sell the plane quickly because the longer Avion holds the plane and pays the interest, the higher the purchase price necessary for Jet to turn a profit.

[10]  Documentation of the negotiation and purchase of the Cessna Citation 650 largely exists in email exchanges.

attorney, Dulac, because Isaacman was very busy.  According to Kerr's uncontradicted testimony, Dulac balked at Kerr's customary five percent commission, which would have yielded Kerr approximately $160,000 on a purchase price of $3,200,000, and Dulac instructed Kerr to see if he could get the seller to pay his commission.[11]  Isaacman testified that he initially thought the seller would pay the broker fee.

As negotiations continued, Kerr informed Dulac that he believed the recently performed Phase 1 - 5 inspection was sufficient to qualify as a pre-purchase inspection for the aircraft but that the aircraft's flight and logbooks should be audited.  (Plaintiff's Ex. 30.)  By email on November 28, 2005, Isaacman advised Kerr that he had instructed Dulac to go forward with the deal and to make the required $50,000 deposit, but he preferred to get a "term sheet" first, meaning a preliminary agreement regarding the terms agreed upon.[12]  (Plaintiff's Ex. 34.)  Dulac, however, had already begun preparing the purchase agreement and in his opinion, it was quicker and more efficient to proceed directly with a purchase agreement.  (Defendant's Ex. 139.)  Dulac told Isaacman by email that he could complete the purchase agreement once they talked about the monetary terms and advised him that the only outstanding issue was "getting the plane into an inspection facility where it, the

---

[11]  The first documented fee negotiations took place on November 25, 2005, when Watkins emailed Kerr stating, "after our conversation today I understand you have some decisions to make."  (Plaintiff's Ex. 38.)  Watkins indicated to Kerr that if he wanted to "back-to-back" the deal, it was fine with Jet, but Kerr must tell Watkins "the amount you are quoting" to the buyer so "I can tell them the same thing."  (Plaintiff's Ex. 38.)  Watkins continued, "or just tell them we have a contract with you and can't disclose that info, or we can just pay you out of escrow at close but will have to know who the buyer is eventually to write a contract.  Let me know how you want to handle your customer."  (Plaintiff's Ex. 38.)  Watkins was apparently willing to permit Kerr to add his own fee on top of Jet's net price if Kerr wanted to.  The evidence is unclear whether the final $3,200,000 purchase price was originally set by Watkins as a sum that would allow him some room to negotiate with the buyer or whether Kerr came up with this figure by adding $150,000 (an amount close to the 5% commission he testified was his customary fee) to Jet's net price.  Kerr did not approach Isaacman himself about a commission until December 21, 2005.

[12]  Apparently, Kerr and Watkins had signed a "term sheet," or letter of intent very early in the negotiations, tentatively agreeing on a price of $3,070,000 for the plane in "as-is" condition.  Watkins explained at trial that he and Kerr had initially discussed a "short sale," meaning Kerr's client would purchase the aircraft in as-is condition and as close as possible to $3,050,000 – the net price Jet's backer would accept.  This document did not identify the buyer, and there is no indication Isaacman was aware of it.  It is clear from Isaacman's testimony that he understood the purchase price was $3,200,000, though it is unclear when Isaacman learned of this price.  As the negotiations continued, it became clear that Isaacman was not interested in purchasing the plane in an as-is condition.

logbooks and maintenance records can be reviewed." (Def.'s Ex. 139.) Dulac commented on the aircraft's recent Phase 1 - 5 inspection, but advised, "if we don't do a pre-purchase inspection, the risk is the incidence of airworthiness discrepancies between completion of the [Phase 1 - 5] inspections and today.  I'm not competent to measure or quantify that risk." (Def.'s Ex. 139.)

The next day, November 29, 2005, negotiations continued.  Kerr continued discussing a possible as-is purchase, the deposit, and his own potential fee with Watkins. In a series of email exchanges, Kerr stated he was ready to "pull the trigger on this deal" and asked Watkins if he would "mind signing a one page agreement" for Kerr's "protection."  (Plaintiff's Ex. 37.)  Watkins responded to Kerr's request by email stating:

> I will sign an agreement that says we will pay you any money that is received that exceeds 3050m [$3,050,000] out of escrow at closing with the understanding that 3050m is our net price, the rest is Mr. Jon Kerr[']s as we previously discussed.  The terms are as is with a logbook research and someone coming to see the plane books and records, to verify all work performed.  Send deposit, let[']s get it done.

(Plaintiff's Ex. 37.)   However, on the same day, email discussions between Kerr, Dulac, and Isaacman reflect that Isaacman was not interested in accepting an as-is purchase with only a records check.  Kerr reported that the Cessna Service Center in Newburgh, New York, had confirmed that the recently performed Phase 1 - 5 inspections would qualify as a pre-purchase inspection, and he attached a quote from the Newburgh service center, confirming a quick turnaround, apparently for a logbook and cursory aircraft review. (Plaintiff's Ex. 50.)  Kerr advised Isaacman to rely on the recently completed Phase 1 - 5 inspections and forego the greater expense of an extensive pre-purchase inspection, but Isaacman responded that, being new to this process, he preferred to insist upon a pre-purchase inspection rather than risk encountering "surprises later on.  Especially surprises in the air."  (Plaintiff's Ex. 50.)  Isaacman stated in an email to Kerr, copied to Dulac, that he did not mind "paying a bit more to know the jet is perfect."  (Plaintiff's Ex. at 50.)  This statement marks the beginning of a significant misunderstanding between Isaacman and his representatives – while Isaacman wanted a 1984 Cessna Citation 650 in "perfect"

condition, Kerr and Dulac negotiated for the correction of "airworthy" discrepancies as per the common industry practice.[13]

Later the same day, Kerr reported back to Isaacman by email that the seller and Dulac were working on the contract language, and the pre-purchase inspection Isaacman wanted could be performed at the Newburgh service center.  (Plaintiff's Ex. at 51.) Isaacman inquired whether the seller would come down on the price; Kerr responded that evening that the seller was "holding strong on the $3.2 number," because the seller had "put over $200,000 in the airplane."[14]  (Plaintiff's Ex. 51.)  However, Kerr reported that the seller and Dulac had reached an agreement requiring the seller to correct any "airworthy discrepancies," which Kerr explained "could be a big ticket item" if Cessna reported that the aircraft needed any major repairs.  (Plaintiff's Ex. 51.)  Kerr assured Isaacman he would be in Newburgh to monitor the inspection process.[15]

That evening (still November 29), email correspondence between Watkins and Kerr shows them continuing to discuss Kerr's commission fee.  Their emails are titled, "FINDERS FEE AGREEMENT," with the first originating from Kerr and stating only, "See enclosed agreement," though no such agreement is attached to the trial exhibit.  (Plaintiff's Ex. 40.)  Watkins responded with some very specific language to be added into "paragraph

---

[13]  According to the experts and airplane mechanic witnesses, it is unreasonable to expect a 21-year-old airplane to be in perfect condition. Jet's expert Dan Scanlon testified, "anybody that's operating an aircraft that's 20 years old has got to expect that it's not going to be a new aircraft."  Anthony Vecchio, director of maintenance at Southern, stated in his deposition, "You're talking about a 21 year [old] aircraft.  If you want to make it new, you can spend a lot of money doing a lot of things."  (Vecchio Depo. at 82.)  Walter Berchtold, general manager of Cessna Orlando Service Center, testified that he had seen good-looking 21-year-old planes, but "[t]here's always something you can find" to fix. (Berchtold Depo. at 79.)  Isaacman stated at trial that he was not concerned about the cost, but obviously this was not clearly understood by either Kerr or Dulac, both of whom negotiated according to the industry standard of airworthiness.  Their discussions with Isaacman during the negotiations naturally focused on obtaining the best purchase price.  The as-is purchase price would have been lower, but instead, they negotiated for the seller to pay for airworthy discrepancies to satisfy what they believed were Isaacman's concerns.  Isaacman was not clearly informed of the meaning of "airworthy" deficiencies by either Dulac or Kerr, and they in turn failed to appreciate that Isaacman genuinely meant he would pay more to have *all* deficiencies corrected.

[14]  Although Kerr did not report the seller's $3,050,000 net price to Isaacman, Kerr was by now aware that Isaacman was not interested in an "as-is" purchase.

[15]  Ultimately, the parties agreed instead to have the pre-purchase inspection conducted at the Cessna Service Center in Orlando, Florida, and Kerr did not personally attend the inspection.

1" of whatever agreement they were discussing and requested, "Please use this one and send back." Watkins' language detailed that the seller would receive a guaranteed net amount of $3,050,000; the purchase price would be $3,200,000, with the seller responsible for correcting airworthiness discrepancies; and Kerr entitled to the remainder of the $150,000 difference after Jet paid the Cessna repair bill for airworthiness discrepancies. Watkins explained that this was a good deal for Kerr because the seller had spent $250,000 on the plane already, assuring Kerr, "This is a good plane." (Plaintiff's Ex. 41.) Kerr would be paid if the deal closed. Kerr expressed concern that, under this scenario, he could end up with nothing because a lot of discrepancies could mean "only the crumbs will be left." (Plaintiff's Ex. 48.) Kerr did not send back a final agreement with his next email but suggested they discuss the matter in the morning. No written fee agreement was introduced at trial.[16] Watkins testified that he preferred that the broker's fee arrangement be incorporated into the aircraft purchase agreement but that Dulac had rejected that proposal.

On December 5, 2005, JDI and Jet entered into the aircraft purchase agreement, drafted by Isaacman's attorney, Dulac. (Plaintiff's Ex. 67.) Although Isaacman had previously indicated he wanted the aircraft delivered in "perfect" condition, Dulac prepared and Isaacman signed a purchase agreement requiring the seller to repair only "airworthy" items (a term left undefined in the agreement but well understood by those in the aircraft industry).[17] The agreement stated a purchase price of $3,200,000.[18] Upon the buyer's

---

[16] Although no written finder's fee agreement was introduced at trial, there is no dispute that Kerr and Watkins did enter into a fee agreement according to the terms outlined in these emails. (Pretrial Stipulation, Doc. 244.) Additionally, at one point, Watkins added that in the event of "any court battle arising between the buyer and seller in this transaction, there will be no finders fee paid at all." (Plaintiff's Ex. 40.)

[17] An airworthy discrepancy generally is one which is serious enough to ground the plane under FAA regulations; however, it is clear from the record that Plaintiff's expert, James MacConnell, agreed that different mechanics can have differing views and opinions on what is and is not airworthy. He also agreed that an opinion on airworthiness attests only to the condition of an individual item at that point in time; it could break the next day. Herb Michael, chief inspector at Southern, testified that he had never seen a purchase agreement where the seller was required to fix *all* items needing repair.

[18] The report of Jet's expert states that the $3,200,000 purchase price was consistent with the Aircraft Bluebook Price Digest for a 21-year-old aircraft.

payment of a $50,000 deposit, the seller agreed to deliver the aircraft and its records to the Cessna Service Center in Orlando, Florida, to undergo a pre-purchase inspection, the nature of which would be specified by the buyer.  JDI agreed to bear the cost of moving the aircraft to the service center as well as the cost of the inspection and records review.[19]  The agreement further provided that following issuance of the inspection report, either side had the option to terminate the agreement by written notice, in which case the deposit would be refunded to the buyer.  Specifically, if JDI was not satisfied with the aircraft based on the results of the inspection, it retained the option to refuse to purchase the aircraft, in which case the deposit would be refunded, or to decline to purchase until the seller cured any airworthiness discrepancies.  If the seller refused to perform corrective measures, JDI had the option to purchase the aircraft "as-is" or elect to terminate the agreement with two days' written notice.  The agreement provided that on the date of closing and delivery, the buyer would execute a delivery acceptance form for the aircraft, acknowledging that the aircraft conformed to the requirements of the agreement.  The agreement obligated the seller to deliver the plane in an airworthy condition, with a standard Certificate of Airworthiness issued by the FAA, with all systems operating in good order, and in compliance with all mandatory service bulletins and airworthiness directives under Federal Aviation Regulations.  The agreement included a disclaimer of all other warranties.  The purchase agreement did not reference payment of Kerr's brokerage fees.

Pre-purchase Aircraft Survey

The aircraft was flown to the Cessna Service Center in Orlando for a pre-purchase aircraft survey, which experts agreed is not a formal inspection.  The December 5, 2005, aircraft survey customer agreement signed by Isaacman requested a standard aircraft survey with some additional tests requested, and it named Kerr and Mary Scales, Kerr's administrative assistant, as the customer contacts for the buyer.  Chuck Farney[20] of the

---

[19]  JDI had the privilege to inspect the aircraft, title, and all records.

[20]  Farney, a crew chief mechanic at Cessna Orlando, has been a licensed A & P (airframe and power plant) mechanic for 18 years, specializing in work on the Cessna Citation model aircraft.  He was the customer service representative at Cessna Orlando responsible for communications between the service center and

Cessna Service Center in Orlando verbally suggested to Kerr that the buyer order a complete Phase 1 - 5 inspection process, but Kerr declined because, as he had discussed with Isaacman and Dulac, the plane had recently undergone a full Phase 1-5 at Southern. Farney testified that it is standard practice at the Orlando service center to recommend the Phase 1 - 5 inspections because not every issue can be identified on a pre-purchase a survey; however, he also confirmed that he did not imply to Kerr that Southern's Phase 1 - 5 was insufficient such that Isaacman should not rely on it.  Farney, on behalf of Cessna, kept both buyer (that is, Kerr, as the customer contact) and seller informed of the survey results as the process progressed.

On December 8, 2005, the service center issued Cessna's initial survey inspection report on the plane, listing 37 "discrepancies" or repair orders, some of which were merely cosmetic or minor and 12 of which were marked as airworthy concerns (these were marked by the letter "A" in the margin of the inspection report).  (Plaintiff's Ex. 73.)  Kerr, Dulac and Isaacman all received and reviewed this report.  In response, Dulac, by email to Isaacman, outlined the contract options available to Isaacman upon receipt of this report, which included either (1) "walking," i.e., terminating the purchase agreement due to the discrepancies found in the survey and obtain a refund of the deposit, or (2) accepting the aircraft on the condition that the "Seller corrects, at Seller's expense, the noted airworthiness discrepancies." (Plaintiff's Ex. 72.)  Neither contract option required the seller to correct every discrepancy; the seller was required to correct only those considered airworthy.  Dulac stated clearly in this email to Isaacman that the first issue to resolve is whether "the non-airworthiness discrepancies are of such a nature that [Isaacman] does not want this aircraft."  (Plaintiff's Ex. 72.)  Dulac suggested they speak with someone knowledgeable about the technical aspects of the aircraft to guide Isaacman on how to proceed.  Isaacman, aware that Kerr was not a mechanic, contacted Paul Schulte and Russell Lash of New World Aviation in Pennsylvania, the company chosen to manage the

---

the customer at the time of the inspection.

aircraft after its purchase, and asked them to review the report.[21]   In emails dated December 9, 2005, they advised that all of the items needed to be fixed to add the plane as a charter plane for New World Aviation.[22]  Lash indicated that he did not disagree with the airworthiness demarcations noted in the report, but stated it would be in Isaacman's best interest to have all of the items repaired.  (Defendant's Ex. 51.)  Isaacman responded that the owner had agreed to fix all items at his expense; Isaacman was satisfied that the issues identified were common repairs.  (Defendant's Ex. 76.)  In another email, Isaacman told Schulte and Lash that the owner had agreed to fix all items, "including the non-airworthy issues."  (Defendant's Ex. 51.)  These emails, which were not copied to Kerr or Dulac, further illustrate a basic misunderstanding on Isaacman's part about the contract terms.  Despite Dulac's prior representations to Isaacman that the seller was responsible to correct "airworthy" items, Isaacman understood the agreement to require the seller to correct *all items* at its expense, although this is not how the contract reads.

While Isaacman was deciding whether to proceed, email conversations continued between Watkins and Kerr.  Kerr emailed Watkins that Farney (at Cessna) had informed him that one of the airworthy discrepancies (an "R/H bleed") would require at least 40 hours of labor to correct.  Kerr asked Watkins to call Farney about this, as Jet was the party responsible under the contract for ensuring that airworthiness repairs were completed; Watkins said he would.  Kerr thanked him and added, "beat the crap out of him."[23]  (Plaintiff's Ex. 74.)  The next day, Kerr learned Cessna was quoting Jet a cost of

---

[21]  Paul Schulte is executive vice president of sales for New World Aviation, and Russell Lash is a licensed A & P mechanic and general manager of the maintenance department at New World Aviation.

[22]  Isaacman wanted to be able to obtain revenue from renting the plane as a charter when he was not using it, but in order to be added as a charter at New World Aviation, the plane would need to meet stricter FAA requirements and certifications than if it were not used as a charter plane.  Additionally, according to Dulac, every management company has its own set of standards for charter aircraft and planes often need upgrades before being deemed "acceptable" for a new management company's charter program.

[23]  Much was made of this email at trial.  JDI attempted to show that Kerr's intent, as evidenced in this email, was to maximize his own profit by working with Jet to bully the aircraft inspector into marginalizing or minimizing the needed repairs, resulting in JDI unwittingly accepting an aircraft with significant defects. Plaintiff's expert James MacConnell opined that in a situation where buyer and seller are colluding to "beat the crap" out of an inspector, "it leaves me with the impression somebody is in bed with somebody."

$49,000 for the authorized repair work, which he thought was high. Kerr's fee arrangement with Watkins undoubtedly gave him a strong incentive to ensure that the cost of the airworthy repairs remained as low as possible, and, indeed, Kerr asked Watkins if anything could be done to keep the cost low. Watkins replied, "whatever the bill ends up being at Cessna we'll have to live with" it. (Plaintiff's Ex. 78.) Watkins was waiting for Isaacman's election on whether to proceed with the airworthy repairs. Late Friday afternoon, December 9, 2005, Watkins urged Kerr to obtain Isaacman's acceptance, and the next day, Watkins commented to Kerr, "oh to be you" – referencing the profit Kerr stood to make from Jet's arrangement to pay Kerr the amount remaining of the $150,000 difference between the purchase price and net price after the repairs. (Plaintiff's Ex. 86.)

On Monday, December 12, 2005, Isaacman elected to proceed with the purchase and authorized Jet to proceed with the repairs. Isaacman told Dulac and Kerr in an email, "I want to make sure everything on that report from Cessna is fixed," and asked whether he would receive some sort of "clean bill of health" or a revised report when the repair process was completed.[24] (Plaintiff's Ex. 89.) Kerr testified that he understood this to

---

Nevertheless, both experts, including McConnell, agreed this type of haggling was a common practice in the industry and that Cessna was known for its high repair costs. Taken in context with the testimony of Kerr and Watkins, the court finds that the email shows nothing more than mere puffery by Kerr intended at most to convince Watkins to negotiate vigorously with Cessna regarding the labor hours and resulting labor costs required to fix the airworthiness problems. While both Kerr and Watkins had an incentive to minimize labor costs, the court finds this email insufficient to establish a conspiracy between Kerr and Jet to defraud Isaacman, to coerce inspectors, or to cover up airworthy defects. Notably, "beating up" Cessna on the cost of airworthy repairs was not to Isaacman's benefit or detriment because Jet was responsible for the cost of airworthy repairs.

[24] Dulac testified by deposition that Isaacman took the weekend to think about whether to go with only airworthiness items or to renegotiate and have everything fixed. Dulac said that Kerr called him Monday morning and told him that Isaacman was not available but wanted to go with just the airworthiness items being corrected. (Dulac's depo. at 80.) Isaacman's instruction that he wanted everything fixed but not requesting any renegotiation of the purchase agreement terms was somewhat ambiguous. By this time, the aircraft purchase agreement, expressly requiring the seller to fix only airworthy items, had already been executed and absent a renegotiation, the seller was only obligated to fix airworthy items.

mean correction of every "airworthy" item on the list, relying on the industry standard as he knew it, as well as the language of the executed purchase agreement.[25]

The Cessna service center proceeded to correct airworthy discrepancies.  The pre-purchase inspection and repair process involved Cessna first identifying items needing repair and marking those deemed airworthiness issues – the December 8 report – and then a period during which repairs would be validated and completed.  All of the experts who testified at trial described this validation process as a normal give-and-take type of "haggling" between the parties and the repair shop based on the differing opinions about the best way to repair an item and/or the amount of labor required.   Additionally, the experts agreed that issues often arise during the review of the aircraft's historical records. Here, Isaacman had purchased a records review as part of the pre-purchase survey. According to the experts, some issues found in a plane's records may be noted as airworthy discrepancies initially but may be later eliminated from the list after clarification of the issue by the aircraft's owner or one familiar with the aircraft's document history. Tony Vecchio, Jet's Director of Maintenance, and James Wallace, President of Southern, who had previously worked for 23 years as the General Manager of Cessna, traveled to Orlando to participate in this validation process.   Isaacman did not send an aircraft mechanic to monitor the survey on JDI's behalf but relied on Kerr and Cessna, the manufacturer and the one ultimately responsible for the inspection.  Kerr testified that he, Dulac, and Isaacman agreed that James Wallace was a qualified Cessna mechanic capable of supervising the inspection.[26]   Kerr, who is not an A & P ("airframe and power plant") mechanic, testified he was not at that time asked by either Isaacman or Dulac to

---

[25]  Isaacman had the right to pay for the correction of non-airworthy deficiencies and doing so would not have reduced Kerr's fee from Jet.  Jet would have remained responsible under the purchase agreement only for the cost of repairing items considered to be airworthy.  However, this type of parsing the responsibility for the cost of repairs never occurred because of the basic misunderstanding between Isaacman, Dulac, and Kerr about the contract terms.

[26]  According to Watkins, Wallace had written the inspection criteria for Cessna in the past and was very knowledgeable about Cessna aircraft.

Case 3:07-cv-00242-MCR-EMT   Document 286   Filed 08/06/10   Page 14 of 40

participate in person at the inspection.[27]  According to Kerr, Dulac and Isaacman instructed him to "move along at a rather quick pace" with the inspection since Isaacman wanted to use the aircraft for the upcoming holiday season.[28]  Kerr asked a friend, Bill Hendrickson, whom Kerr said was involved in airline operations, to visit the Orlando service facility periodically during the inspection, which he did, and he advised Kerr that Cessna's work on the aircraft was moving along.  Satisfied with Hendrickson's reports, on December 14, 2005, Kerr advised Dulac and Isaacman that everything was going well and that Watkins had "authorized all the work."  (Plaintiff's Ex. 97.)  The next day, December 15, Kerr again assured Isaacman all was going very smoothly.

As part of the validation process, Cessna generated a second discrepancy report dated December 13, 2005 (sent on December 16), which listed 114 discrepancies on the aircraft.  The report was sent to Kerr on December 16.  Email exchanges between Watkins and Kerr show their frustration over the added discrepancies on this list.  Kerr wrote to Watkins that he was not happy about the new list – he had heard the bill might be over $50,000 – and stated this was "not working out" as he had hoped.[29]  (Plaintiff's Ex. 100.) Watkins consoled Kerr, stating he thought Kerr could still receive between $90,000 and $100,000 on the deal.  Notes from Watkins indicate he was working with Cessna to resolve

---

[27]  It is unclear whether Isaacman knew Kerr would not personally attend the inspection; Isaacman testified that he had understood Kerr would be present as Kerr had assured him earlier (when they were considering an inspection at Cessna Newburgh) that he would be there.  According to Kerr, he did not offer to go to Orlando and instead only offered to be present when he thought the inspection would be at the Newburgh facility.  Kerr said he was not asked to personally visit the Orlando facility and that both Isaacman and Dulac were aware that he was not a mechanic.  There is no question Isaacman relied on the independent inspection process in making his decision to purchase the plane.  Cessna Orlando was a qualified service center with no connection to either party.  The court credits Kerr's testimony that he, Dulac and Isaacman agreed that James Wallace of Southern was qualified to attend and monitor the inspection.

[28]  As it turned out, consistent with Kerr's testimony, Isaacman was able to use the plane during the New Year's holiday.  As noted previously, Isaacman also stood to gain a tax advantage by closing the deal prior to the end of the year.  Isaacman did not reveal the exact amount of the tax implication at issue but admitted it was in the "low hundred thousand" range.  He maintained, however, that this was not a make or break consideration for him.

[29]  Watkins testified in his deposition that although Kerr may have "cried and whined along the way for anything that had to be fixed on the airplane, because that would affect how much money he received," the airplane was nevertheless treated as any other.  "We went down and just validated the airplane, and then whatever it cost to fix it, they fixed it."  (Watkins' Depo. at 40-41, Jt. Ex. 144, Tab 30.)

Case No. 3:07cv242/MCR/EMT

the issues.  Watkins testified that he wanted to clear up some of the paper work and parts traceability issues on the report with Cessna before Isaacman saw this intermediate list.[30] Watkins acknowledged to Kerr that Cessna had "dug up some issues," but he assured Kerr "this is a good plane."  (Plaintiff's Ex. 101.)  Consistent with the testimony of the experts, Watkins testified that Cessna had a reputation for being quick to replace, rather than repair, items, and, as he noted in an email to Kerr, then "we[']re stuck with it."  (Plaintiff's Ex. 102.)  Although Kerr had no independent recollection of sending the report to Isaacman or Dulac, he testified that he and his secretary were in the habit of forwarding everything to Dulac, Isaacman's attorney.  Isaacman was unclear about when he received this report but admitted he had seen it.

On December 19, 2005, Dulac sent Isaacman the "Acceptance Certificate" to sign acknowledging acceptance of the aircraft, which was required under the purchase agreement for the seller to move forward with repairs.  (Plaintiff's Ex. 114.)  This made the deposit nonrefundable, subject to the seller's timely completion of required corrective work.[31]  Isaacman, again clearly not understanding the purchase agreement, stated to Dulac, "I don't know why I am providing an acceptance of the aircraft and dating it – when I have not received the aircraft or the final inspection/repair results from Cessna.  I am providing this form with the understanding that it does not undermine any of my rights under the purchase agreement."  (Plaintiff's Ex. 36.)  The same day, amid discussions

---

[30]  On December 17, 2005, Watkins wrote in an email that Cessna was "busting my chops" on this deal – he stated the buyer expected to close in a few days but anything still on the list and not signed off will have to be paid for – "much money and I will get in trouble as my backers will see I have this list and a bill from Cessna on these things, big mess[;] also buyer will see list and Cessna will charge my ass off, need to get answers so as to sweep these issues under the rug for many reasons, otherwise big Cessna bill is coming, hot water here."  (Plaintiff's Ex. at 110.)  Watkins explained that this email simply expressed his frustration over the validation process.  He testified that many issues noted as discrepancies can be cleared up through the process and he wanted to clear up the problems to the extent possible before either Isaacman or his own backer saw the list.  The experts agreed that this type of "haggling" and negotiating is commonplace in the industry.

[31]  The purchase agreement states that at the end of the inspection period or before, the buyer must sign a form "Acceptance Certificate" which makes the deposit nonrefundable, subject to the seller's timely performance of the corrections.  Then, at the time of delivery, the purchase agreement required the buyer to execute a "Delivery Acceptance" form, acknowledging at that time that the aircraft conforms to the requirements of the agreement and that the buyer is accepting the aircraft.

regarding when to close the deal, Watkins wrote to Kerr, "Waiting on Cessna, will bust the[ir] chops tomorrow and keep you updated."  (Plaintiff's Ex. at 113.)  On December 20, 2005, Kerr again assured Isaacman that all was proceeding smoothly, and closing should occur within the week, adding, "After speaking with Cessna, your jet is going to be in perfect shape.  I don't think they missed  anything – great job on their part.  The seller isn't the happiest camper out there since he had to pay for the repairs – kudos to Don [Dulac] on that one."[32]  (Plaintiff's Ex. 122.)

On December 21, Kerr emailed Isaacman, approaching him apparently for the first time about the possibility of arranging a commission for his work, informing him that "someone in my capacity usually gets 2 - 4 points for identifying an aircraft for purchase.  In this case, I have not only identified and negotiated (at a wholesale price) the aircraft, but also . . . set up and monitored" the pre-purchase inspection, secured financing, and named a customer willing to purchase 30-40 charter hours for the month of January.  (Plaintiff's Ex. at 126.)  Kerr also suggested to Isaacman that Kerr's company could manage the aircraft for JDI.  In a lengthy response, Isaacman regretted not discussing these issues sooner, as he preferred to work out details up front.  Isaacman informed Kerr he had already promised the management of the plane to New World Aviation.  Being new to this business, Isaacman said he had assumed the seller would pay Kerr's commission, and added, "I have since learned that this is not the case."[33]  (Plaintiff's Ex. 127.)  Isaacman felt

[32]  JDI notes that during this time, Kerr was emailing Watkins indicating he felt like he just "stepped on a hornets nest – everybody calling me for answers."  (Plaintiff's Ex. 129.)  Context shows, however, that this reference was not an indication that items were not being disclosed or fixed but rather was an attempt to set a closing date and get the needed repairs finished.  The related emails in this exhibit show that the work on the plane was progressing.  Kerr and Watkins were attempting to schedule closing for December 23; Kerr was busy contacting Dulac, the bank, and Cessna to set the closing date.

[33]  In his deposition testimony, Isaacman stated that there was initially no agreement with Kerr but that their relationship changed over the course of their dealings.  "[T]here was no agreement.  This was someone who I saw take charge, and . . . I appreciated the assistance.  When he identified an aircraft I was interested in, I let him take the lead, knowing that I was going to pay some sort of commission at the end."  (Isaacman's Depo. at 79; Jt. Ex. 143, Tab 3.)  However, Isaacman's email to Kerr in late December clearly indicates that he thought the seller would pay Kerr's commission, and Isaacman admitted in his deposition that he did not have complete faith from day one that Kerr was representing only Isaacman's (that is, JDI's) interests but Isaacman said he had no reason at the time of closing to think Kerr was acting contrary to his interests.  (Isaacman's Depo. at 82, 84; Jt. Ex. 143, Tab 3.)

the requested commission was too high, and thus he attempted to negotiate for a lower fee by advising Kerr of his intent to sell the plane and buy another within twelve months and expressing a desire to use Kerr for those transactions as well.  Isaacman asked Kerr to reconsider his commission request, bearing in mind the possibility of future transactions and that Isaacman would be a good client for Kerr.  Kerr responded, "Some guys just mark-up the airplane from the seller to the buyer – I really didn't want to do that.  I'd rather be straightforward and upfront about everything." (Plaintiff's Ex. 127.)  Kerr told Isaacman that he had dealt with "one difficult seller" in this transaction who complained about the bill he had to pay to Cessna.  (In fact, Kerr and Watkins both understood that the repair cost would come out of Kerr's own potential commission from Jet, and this likely was Kerr's motivation for turning to Isaacman in late December for part of his commission.)  Isaacman ultimately agreed to pay Kerr $70,000 at closing.

The final discrepancy list generated at Cessna Orlando on December 27, 2005, contained 124 discrepancies on the aircraft, with notations by each item indicating whether it had been corrected, "deferred," or listed for "information only."  Of these 124 discrepancies, 21 items were listed as deferred and were not repaired.  Watkins testified that the items deferred were deemed not airworthy or, in other words, optional to repair and that all airworthiness discrepancies were repaired.  According to Watkins, the Cessna service center would not permit airworthy items to be deferred without a paper signature by the aircraft's owner (Jet, in this instance) which would be forwarded to the purchaser of the pre-purchase survey (JDI/Isaacman, in this instance).  The Cessna bill for the corrective work totaled $78,686.61.

The records indicate that James Wallace of Southern faxed the Cessna bill and the final discrepancy report (25 pages total) to Kerr's assistant, Mary Scales, at Kerr's office on December 28, 2005, at 10:51 a.m.  (Plaintiff's Ex. 171.)  There is no document showing that the report was forwarded on to Dulac and Isaacman, but Kerr stated that Dulac received the final report from his assistant, Mary Scales.  In Dulac's deposition testimony, he said he did not receive it until early January 2006, which was after the December 29 closing date (the copy in Dulac's file shows it was faxed from Cessna to MacConnell at

New World Aviation on January 4 and then forwarded to Dulac by New World Aviation).
Kerr testified that he instructed Mary Scales to forward everything to Dulac and that it was
her practice to do so; Scales agreed that it was her practice to forward all information to
Dulac, though she could not recall whether she had forwarded the report that day.  Notably,
the repair bill was page number 3 of the 26-page final report packet faxed to Kerr's office,
and clearly both Dulac and Isaacman knew the exact amount of the repair bill prior to
closing.  Isaacman recited the total in an email to Dulac at 5:05 p.m. on December 28 as
part of a funding summary, instructing Dulac to provide wiring instructions to National City
Corporate Air Capital.  (Plaintiff's Ex. 138.)  (By agreement of the parties, Isaacman paid
the Cessna bill and was reimbursed at closing.)  While it is possible that Mary Scales faxed
only the bill to Isaacman and Dulac, extracted from the 26-page fax, it is more likely, in the
court's view, that Kerr's office forwarded the entire final discrepancy report, which included
the bill, to Dulac prior to closing in the ordinary course of business, regardless of whether
Dulac actually saw it prior to closing.[34]

Closing

On December 29, 2005, following completion of the pre-purchase survey and
repairs process, the plane was flown from Orlando, Florida, to Wilmington, Delaware, for
closing with an FAA certificate of airworthiness and without incident.  Watkins was at his
office that day, and he had advised Dulac that he was available for consultation if needed.
Isaacman, Dulac, and Watkins all participated in the closing by telephone, and Kerr
attended in person in Delaware.  According to Kerr, no one inquired about the final report,
though they had to have known of its existence by this time, and he assumed they had
received it.  Isaacman admitted in his deposition testimony that he had seen the items that
were listed on the final report and knew these problems existed prior to closing; he just had

_____

[34]  Dulac testified by deposition that he had asked Kerr for the final inspection report but Kerr said he
was en route to the closing and unable to send it at that time.  According to Dulac, he and Isaacman had
trusted Kerr to monitor the plane's conformity to the contract requirements, and when they asked for the final
report on the day of closing, Kerr had assured them that all repairs had been completed.  Kerr testified to the
contrary at trial that he was not asked for the final report prior to closing, and he assumed Dulac and
Isaacman had received it.

not seen the final report with comments showing that some of the items had been deferred and not repaired. (Isaacman's Depo. at 72.) At closing, Kerr conducted a walk-around inspection of the aircraft and noticed and reported a problem with the front nose tire tread. Watkins testified he had noted this as well and had been concerned about it but ultimately did not fix it because it was not considered an airworthy problem. Kerr testified that he called Dulac and Isaacman about the problem because he considered it significant, and was told to proceed with closing in spite of it. Kerr also testified that Watkins agreed to fix it at Jet's expense. Isaacman admitted that Kerr reported this problem to him and Dulac before the deal closed but he was not concerned about it; the closing proceeded as scheduled. JDI paid Jet $3,200,000. Jet retained $3,050,000 of the purchase price, paid Cessna $78,686.61 for the repairs, and paid Kerr the remaining $71,313.39 – representing the $150,000 difference between the purchase price and Jet's net price, less the cost of repairs. Kerr also received $70,000 from Isaacman following the closing.[35]

Isaacman Discovers Deferred Defects

Immediately after the closing, Isaacman had the aircraft flown to New World Aviation in Allentown, Pennsylvania, in preparation for his first trip in the plane. After some initial minor repairs,[36] Isaacman and friends flew to Atlantic City. He also flew to Florida and California and back within the first few days after closing. Although the plane operated normally and without incident, the pilots on one of the first trips noted some "squawks," or minor items needing repair. The pilots did not ground the aircraft or deem it unairworthy but continued on the scheduled trips.[37] Nonetheless, Isaacman was unhappy that the

---

[35] Kerr thus collected a total of $141,313.39, as his part of the deal, which was within the range of the commission he had expected at the outset. There was no expert testimony presented at trial regarding the standard commission in the industry for this type of transaction.

[36] James MacConnell, JDI's expert, testified that some of the initial concerns addressed at New World Aviation included tape over the fuel vent, a stuck lens cover on the windshield ice detector light, application of a sealant, and the need for flashlights and some replacement light bulbs.

[37] Isaacman, now a pilot himself, agreed that every pilot has a duty to perform a preflight inspection and to ground an airplane he deems unairworthy. Isaacman admitted that his pilots did not ground the airplane before or after any of the flights taken immediately after the aircraft was purchased, notwithstanding the "squawks."

items had not been repaired at the Cessna Service Center during the pre-purchase inspection survey process.  He emailed Dulac on January 1, 2006, to inform him there were some problems with the plane and to inquire regarding possible recourse against the seller due to the outstanding defects.  Dulac again explained to Isaacman that the contract required Jet to correct only "airworthy" deficiencies, but Isaacman insisted he wanted everything fixed.  According to Isaacman, he first learned that some items on the deficiency list had been deferred instead of repaired when he received an email from New World Aviation upon landing in California a day or two after the closing.  Isaacman denied having previously seen the final inspection report and expressed surprise at finding that it listed many items as deferred instead of repaired prior to closing.  In his deposition, however, Isaacman admitted he knew of the problems that existed with the plane (he had assumed everything would be fixed) but had not seen the final report showing that some items were deferred instead of repaired.[38]  (*See* Isaacman's Depo. at 62-72.)

After the initial flights, Isaacman had New World Aviation inspect the aircraft.  On January 12, 2006, New World mechanics compiled a list of 46 items needing repair and its chief inspector grounded the plane on the basis of these discrepancies.  After obtaining a special ferry permit, New World transported the plane to the Cessna service center in Newburgh, New York.  At JDI's expense, the Cessna Newburgh service center performed a complete Phase 1 - 5 inspection process and repaired all outstanding deficiencies by February 15, 2006.

Opinions on Airworthiness

JDI submitted the expert opinion of James MacConnell.[39]  MacConnell was employed as a chief inspector by New World Aviation at the time Isaacman purchased the

---

[38]  Nevertheless, it is undisputed that Isaacman signed the acceptance form on December 19, 2005, which made the deposit nonrefundable and committed him to honoring the purchase agreement as long as Jet repaired all airworthy items.

[39]  MacConnell has been an FAA certified A & P mechanic for 38 years.  He also holds an extended certificate for inspection authorization, which allows him to perform annual inspections and complete return-to-service paperwork.  MacConnell is currently employed at 26 North Aviation, a company in which Isaacman is an investor.

Cessna Citation 650, and it was his decision to ground the plane on January 12, 2006. MacConnell said he noticed problems with the aircraft when it arrived after its purchase and that New World Aviation began fixing the pilot "squawks" in early January.  MacConnell decided that the problems were too numerous.  He thus grounded the plane in mid-January and sent it to the Cessna Newburgh service center for repairs and a new complete Phase 1 - 5 inspection.

Although MacConnell conceded Cessna Orlando's pre-purchase inspection survey was quite extensive for a survey, he nonetheless felt that a Phase 1 - 5 inspection would have been a more appropriate pre-purchase inspection.  MacConnell explained that there is no certified inspection known as a pre-buy and said that a survey inspection, such as Isaacman purchased from Cessna Orlando, is based on conjecture and opinion.  At trial, MacConnell agreed with the testimony of other mechanics that there was nothing improper about the seller overseeing the inspection and participating in the validation process to ensure the inspection facility did not replace items that did not need replacing or to answer questions about the aircraft's logbooks and maintenance records.  MacConnell also freely acknowledged that there is commonly a give-and-take negotiation process between a buyer and seller over repair issues; "they always end up banging heads somewhere along the line until they come to a decent mediation."  However, the survey provides only a view of the aircraft's general health or condition and does not certify airworthiness.  MacConnell explained the Phase 1 - 5 inspection process generally, stating that the Phase 1 - 4 inspections are due every 24 months and the Phase 5 extended inspection program is due every 36 months.  He acknowledged there had been only 25 to 30 hours of flight time between Southern's Phase 1 - 5 inspection begun in late summer 2005 and the Cessna Orlando pre-purchase survey in December 2005; yet he stressed there was a surprising number of deficiencies noted by Cessna Newburgh.

According to MacConnell, the items deferred and not repaired at the Orlando Cessna Service Center rendered the plane unairworthy.  One of his major concerns involved the main cabin door.  Cessna Orlando had replaced a secondary seal on the door, but MacConnell, relying on a report generated subsequent to the closing, deemed the door

an airworthy issue because it was stiff to operate.[40]  Watkins testified that the cabin door was operational when the plane left Orlando, noting that Jet had paid Cessna Orlando to replace the worn portions of the seal.   When MacConnell sent the plane to Cessna Newburgh for repairs in January, requesting adjustments to improve the fit of the door, Jeffrey Rich, a mechanic at Cessna Newburgh, stated in an email dated May 11, 2006, that he had found the door to be difficult to open and close from inside the cabin, but said:  "To state the door was unairworthy upon arrival would be a gross overstatement.  The door operated safely, albeit not as smooth as the customer wanted."  (Defendants' Ex. 101.)

MacConnell noted additional concerns, including items such as the worn nose tire, landing gear indicator lights that would not dim, a fuel gage that had reported an incorrect reading, loose flap handle covers, and a broken connector on the copilot's side window, among others.  Although the nose tire was worn beyond limits at delivery and had to be replaced, Isaacman accepted the plane with full knowledge of the problem.  MacConnell acknowledged that the inability to dim the landing gear indicator lights would only annoy a pilot.  The faulty fuel gauge indicator light was on an auxiliary tank, not the main tank, and MacConnell acknowledged that it was an intermittent problem.[41]  MacConnell was concerned that the loose flap handle cover could have caused problems during deployment of the landing flaps, which are necessary for flight operation, and that a broken connector on the copilot's side window could have interfered with the de-icing capabilities on that side of the plane, also a potential "inflight" problem.

JDI also presented the expert report and deposition testimony of Wayne Garner, president of Big Sky Aviation and an A & P mechanic.  Garner stated that Cessna Orlando

---

[40] Cessna Newburgh first said the door was stiff, but airworthy, until MacConnell argued about it, and then Cessna Newburgh changed its opinion and marked this as an airworthy item.  No problems with the door had been reported on the flight from Cessna Orlando to Delaware or during the first few flights after closing. Pilots had complained that the door was stiff to operate but had not complained of the seal. Again, notably, no pilot grounded the plane over this issue.

[41] Watkins testified that the problem with the fuel gauge light was intermittent; and Jeffrey Rich of Cessna Newburgh agreed that this was a highly intermittent problem.  Rich concluded that this was possibly not a problem, or might not have shown up, when the aircraft was in Orlando.

missed one airworthy discrepancy, that is, wear and deterioration in the main cabin door.[42] In his opinion, "almost every one of the[ ] deferred items would render the plane not airworthy within the exacting standards of the [FAA];" and he also stated the plane would have failed an FAA "visual or ramp inspection" at the time it left Orlando.[43]   (Plaintiff's Ex. 178, at 3.)  Garner noted that Cessna Orlando's records check failed to disclose that the engine mounts and bolts had been changed, and thus, the age of these parts could not be verified.  Garner explained that under industry standards, such a record-keeping defect rendered the plane unairworthy.  Garner speculated that the plane must have been in an unairworthy state when it left Orlando because it was "placed on a ferry permit immediately following the sale."[44]  (Plaintiff's Ex. 178, at 3.)

Jet's expert, Dan Scanlon,[45] disagreed with JDI's experts with regard to the plane's airworthiness.  According to Scanlon, all airplanes have a good deal of built-in redundancy with multiple pieces of equipment capable of performing the same tasks.  Thus, in his opinion, the failure of one piece of equipment does not necessarily mean that the aircraft is unairworthy.  He explained that the FAA produces a master minimum equipment list ("master MEL") designating the equipment that must be functional on an aircraft, and an aircraft is airworthy in the eyes of the FAA if it meets the master MEL.  Basing his opinion

---

[42]  Garner's report also opined that the Phase 1 - 5 inspection performed by Southern was inadequate because several repairs performed by Cessna Newburgh "in all likelihood existed at the time of the Phase 1 - 5 Inspection."  (Plaintiff's Ex. 178, at 2.)  The report specifically refers to long-term wear on the main cabin door, but, as noted above, Cessna Newburgh's mechanic did not consider the issues with the door to have rendered the plane unairworthy.  The court granted judgment in favor of Southern for the reasons stated on the record during trial.

[43]  Garner's report does not cite to any specific FAA regulations that the aircraft failed to meet.

[44]  Again, this decision was not made by a pilot but instead by JDI's expert James MacConnell.

[45]  Scanlon has been an A & P mechanic since 1965 and holds an engineering degree.  Scanlon was a commercial airline pilot for 25 years.  Also, after working as an aircraft engineer for several aviation companies, including Cessna Citations, he began his own aircraft maintenance business, Certified Aviation Services Inc., located in San Bernardino, California, which he has operated for the past 20 years and which is authorized to work on Cessna Citations.  His company employs 220 mechanics, has 35 airline customers, including commercial airlines.  The company performs approximately 7,000 maintenance tasks per month and undergoes FAA mandated audits for quality and workmanship.  His company has never been cited for a violation.

on the master MEL for the Cessna Citation III and his review of the evidence, Scanlon testified that he believed the aircraft was airworthy when delivered at closing on December 29, 2005.  Scanlon reviewed the final discrepancy report and thoroughly explained how each problem identified by JDI was not an airworthy issue at the time of closing. Regarding the cabin door, Scanlon said that to be airworthy the door must function so it can be opened quickly, and it must hold pressure.  His review of the record indicated that all complaints about the door prior to delivery related to closing the door and, in his opinion, difficulty in closing the door does not indicate an air safety concern once the door is closed.[46]   In Scanlon's opinion, Cessna doors are often hard to close because of their design, and it was even possible that this main cabin door functioned differently in December than it did in January when New World Aviation noted a problem.[47]   Scanlon noted that no pilot had a concern about door safety before the plane left Orlando or on the trip to Delaware for the closing.  He further noted that Cessna Orlando replaced a secondary door seal which, in his opinion, was not an airworthiness concern because it was not the main seal.[48]

According to Scanlon, the other items of concern to JDI and discussed by MacConnell, and noted by Garner, were minor, such as intermittent problems with a reserve fuel tank indicator light; dimmer switches that would be only an annoyance to a pilot but not a hazard; various caps and covers that did not involve safety issues; and light bulbs needing replacement.  Scanlon testified that none of the items deferred and not repaired on the final report affected the plane's airworthiness status.  He further concluded that the seller went beyond its obligation by authorizing and paying for several items that he did not consider airworthiness concerns.  While Scanlon initially noted a problem tracing

---

[46]  Here, there was never any indication that the door would not close or that it leaked air, only that it was difficult to close.

[47]  Even JDI's expert, MacConnell, admitted that an airworthiness determination only confirms the condition of the aircraft at that time; something could always break the next day.

[48]  Although not an airworthy problem, Watkins approved this seal for repair at Orlando, to be paid for by Jet.

the engine mounts in the aircraft's maintenance records, he testified that he had since learned from Herb Michael, Southern's chief inspector that the engine mounts were in fact new within the last year, which was within the 10,000 hour limit for the parts, eliminating any airworthiness problem in the documentation.[49]

Anthony Vecchio, director of maintenance at Southern, and his chief inspector, Herb Michael, testified at trial and by deposition.  They participated in the verification process during the pre-purchase survey and the records review at Cessna Orlando.  Vecchio and Michael each testified that from their experience and observations of the aircraft and its records, the plane was airworthy when it left Orlando, and the cabin door was working satisfactorily when the plane left Southern.  Michael had been in and out of the plane a number of times for various inspections at Southern and had not noticed a problem with the door's operation.  He testified that Cessna Orlando repaired a seal on the door frame, which he explained was a secondary seal to keep rain water from entering the plane; it was not the main pressurization seal.  Vecchio stated if there was any question that the door was an airworthy item when it left Orlando, he would have expected it to be written up by Cessna.  Consistent with the opinion of all the mechanics who testified, Vecchio said that Cessna is known for doing more work than is necessary and charging more for that work.

Nether Vecchio nor Michael advised or heard anyone attempt to influence a Cessna mechanic to hide any discrepancies on this aircraft.  Both testified that when a mechanic identifies an airworthy problem, it is always noted and there is no negotiation over whether to report it.  They each testified that discussions may occur regarding the best option for resolving a discrepancy, such as whether a part should be repaired or replaced, because there are ways to keep costs down, but, as Michael testified, a discrepancy is either fixed or the owner is required to sign off that it has not been repaired.  Vecchio testified similarly that in his opinion, an A & P mechanic would not bypass an airworthy item on a plane to save someone money because the mechanic must sign for the work he does, and his work

---

[49] In Michael's deposition testimony, which was introduced at trial, he stated that the logbooks indicate Garrett Aviation Services had changed the engine mounts and bolts and replaced them with new ones during an engine repair completed in June 2004 as part of a manufacturer's periodic inspection.

also must be approved by a chief inspector.  Vecchio stated, "We cannot jeopardize the repair station to lose its license over some guy wanting to save a few."

When asked about Cessna's recommendation for a complete Phase 1 - 5, as opposed to the survey done, Vecchio testified that it would have been redundant to perform another Phase 1 - 5 inspection so shortly after Southern had performed it because this type of inspection is ordinarily performed every 36 months or 1200 hours, whichever comes first.  The record establishes that there had been less than 6 months and only 25-30 flight hours since Southern had performed a Phase 1 - 5 on this aircraft.

Chuck Farney from Cessna Orlando testified by deposition that it is standard practice at Cessna Orlando to recommend a full Phase 1 - 5 inspection; he said "You can't inspect the whole airplane on a survey."  He said that Kerr signed off on that suggestion because this aircraft had recently undergone a Phase 1 - 5 at another maintenance facility. In response, Farney told Kerr that was not the same as having the inspection done by Cessna (reputed to be the gold standard), but he testified that he did not mean to imply that the recently performed inspection was unreliable.  According to Farney, he and Kerr spoke frequently about the scope of the work and what was happening during the survey inspection process, and he verified that the cabin door was operational.  Farney stated that the work Cessna performed on the aircraft during the pre-purchase survey inspection was airworthy, and as far as he was aware, Cessna Orlando repaired all the airworthiness issues it discovered.

**CONCLUSIONS OF LAW**

There is no dispute that Florida law governs this diversity suit.

Breach of Contract and Implied Covenants

Breach of contract requires proof of three elements: (1) a valid contract; (2) a material breach; and (3) damages.  *Rollins Inc. v. Butland*, 951 So. 2d 860, 876 (Fla. 2d DCA 2006).  JDI argues that Jet breached the aircraft purchase agreement by interfering with the pre-purchase inspection process, contrary to its duty of good faith and fair dealing, resulting in its delivery of an aircraft with significant defects.  "The implied covenant of good faith and fair dealing applies to every contract."  *Meruelo v. Mark Andrew of Palm Beaches,*

*Ltd.*, 12 So. 3d 247, 250 (Fla. 4th DCA 2009).  The purpose of the implied duty of good faith is to protect the reasonable commercial expectations of the parties, and it usually becomes an issue when there is an express contractual obligation over which one party has sole discretion.  *Id.* at 251. A party's breach of the covenant of good faith is not an abstract concept independent of the contract terms but "must relate to the performance of an express term of the contract."  *Id.* at 250 (internal marks omitted).  "Under Florida law, a party breaches this implied covenant by a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence; but, rather by a conscious and deliberate act, which unfairly frustrates the agreed common purpose and disappoints the reasonable expectations of the other party." *Tiara Condominium Ass'n, Inc. v. Marsh & McLennan Companies*, 607 F.3d 742, 747 (11th Cir. 2010) (internal marks omitted)*.*

The evidence does not support JDI's claim that Jet interfered with the pre-purchase inspection process.  The purchase agreement placed JDI in control of the pre-purchase inspection, and JDI alone arranged for the inspection/survey to be conducted by Cessna mechanics at the Cessna Orlando service center.  Isaacman, Kerr, and Dulac agreed that Jim Wallace, a mechanic at Southern, was qualified to oversee the pre-purchase survey. More importantly, there is no evidence of any collusion by Jet to cover up airworthy concerns; Cessna itself was in control of the survey.  The evidence shows that Cessna mechanics found more discrepancies as the pre-purchase process progressed, a common occurrence in the industry, and that Jet, which was responsible for payment of airworthy repairs, proceeded to validate and authorize repair of those discrepancies deemed airworthy by Cessna mechanics, in accordance with the common industry practice.  All of the mechanics who testified agreed that it is common practice for sellers and buyers in the aircraft market to engage in this type of haggling over the cost of repairs and the best method of repair.  Additionally, all agreed that record-keeping discrepancies can often be cleared up with further discussion and examination of the aircraft's records by someone

already familiar with them, i.e., the seller.[50]  Moreover, the evidence shows that mechanics exercise judgment in determining whether a discrepancy involves an airworthy concern, and opinions may differ, as with most inspections.  Although judgment and opinion surely played a part in Cessna's inspection, there is no evidence in this record from which to even infer that anyone from Jet convinced a Cessna mechanic to change or ignore an airworthy designation.[51]  To the contrary, the evidence shows that Jet actually authorized, and paid for, the repair of some items that were not deemed airworthy by Cessna.

The aircraft purchase agreement required Jet to deliver the aircraft in an airworthy – not perfect – condition on the day of closing.  The aircraft purchase agreement did not define the term "airworthy" nor did it specify who would decide whether or not a discrepancy was airworthy if a dispute arose.  The agreement simply warranted that the aircraft would be delivered in an airworthy condition with an FAA certificate of airworthiness.  *See* Fla. Stat. § 672.313(1)(a) (stating a promise made by the seller "which relates to the goods and becomes a part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise").  The court is convinced from the evidence of record that Jet delivered the aircraft in conformance with the contract.  In fact, the only evidence of a possible airworthy defect in the aircraft at the time of delivery was a bald nose tire, which JDI had full knowledge of and agreed to accept and according to Kerr, Watkins agreed to fix.  The court accepts the testimony of Jet's well-qualified expert, Scanlon, that there were no other airworthy defects at the time of delivery. During trial, Scanlon addressed each deferred defect that JDI's expert, MacConnell, had indicated was a concern and credibly explained why none of the items presented an airworthiness problem.  Notably, Scanlon rejected the primary concern about the main cabin door being difficult to close on grounds that no one had reported difficulty opening the door, which would have been an airworthy problem.  Additionally, Scanlon relied on the fact that no pilots had noted airworthy defects or grounded the plane on Isaacman's trips

---

[50]  Here, Herbert Michael.

[51]  Cessna either repaired the item or clarified the maintenance records.

immediately after closing.  According to Scanlon, if the pilots thought the door was not closing or sealing properly, as noted in the later reports from Cessna Newburgh, they would have noted the problem and immediately grounded the plane instead of flying it to Delaware for the closing or on Isaacman's first trips after closing.  Also, the door was working satisfactorily according to Michael of Southern and Farney of Cessna Orlando.  The plane was not grounded until mid-January 2006, and then by MacConnell, not a pilot.  The court finds that the aircraft was delivered in an airworthy condition, fulfilling the express warranty of airworthiness required in the contract, and Jet did not breach a duty of fair dealing.

To the extent JDI claims breach of implied warranties of merchantability, the claim is without merit because all implied warranties were effectively waived.  A seller may exclude implied warranties by an express and conspicuous provision referring to either the implied warranty of merchantability or implied warranty of fitness.  Fla. Stat. § 672.316(2).  The disclaimers of implied warranties in the aircraft purchase agreement are plain and conspicuous, set forth in a separate paragraph with bold font and capital lettering.

Additionally and notably, JDI accepted the aircraft at closing after a reasonable opportunity to inspect it.  Acceptance of goods occurs when the buyer, after a reasonable opportunity to inspect them, signifies that the goods are conforming or will be accepted despite a nonconformity; or if the buyer fails to make an effective rejection after having a reasonable opportunity to inspect the goods.  Fla. Stat. § 672.606.  An acceptance with knowledge of a nonconformity cannot be revoked because of that nonconformity.  Fla. Stat. § 672.607.  Furthermore, when a buyer has examined goods before entering into the contract or has refused to examine the goods, there is no implied warranty with respect to defects that the examination should have revealed.  Fla. Stat. § 672.316(3)(b).  JDI was permitted ample time to inspect prior to the deposit becoming nonrefundable, at any time during Cessna's performance of the survey and repair work, and again upon delivery on the day of closing.  JDI ordered and paid for the independent inspection undertaken at the Cessna Orlando service center, specified the nature of the inspection to be completed, and relied on that independent process.  Instead of sending a mechanic from New World

Aviation to personally inspect the aircraft or to monitor the inspection process, JDI relied on Kerr, knowing he was not a mechanic, as well as Wallace.[52]  JDI accepted delivery at closing following a reasonable opportunity to inspect and cannot now revoke the contract on the basis of an alleged nonconformity.[53]

Tortious Interference

JDI also argues that Jet tortiously interfered with its relationship with Kerr.  The elements of tortious interference with a contractual relationship are (1) the existence of a contract; (2) the defendants' knowledge of the contract; (3) the defendants' intentional procurement of the contract's breach or interference with the contractual relationship; (4) the absence of any justification or privilege; and (5) damages.  *See Fla. Tele. Corp. v. Essig*, 468 So. 2d 543, 544 (Fla. 5th DCA 1985).  According to JDI, the evidence at trial established that Kerr was in fact an agent of Jet at the same time he served as JDI's agent, unbeknownst to JDI, and that Jet thereby interfered with the agency relationship between JDI and Kerr.[54]  The court disagrees.

---

[52]  The court credits Kerr's testimony that he was not asked to travel to Orlando and that Isaacman, Kerr, and Dulac agreed Wallace was qualified to oversee the inspection process.

[53]  It is worth noting that Isaacman was represented by counsel in this transaction, he is a sophisticated businessman in charge of a large, highly successful company, and his own attorney drafted the purchase agreement.

[54]  In Florida, contracting parties must use traditional contract remedies to redress their purely economic losses.  *Cessna Aircraft Co. v. Avior Techs., Inc.*, 990 So. 2d 532, 537 (Fla. 3d DCA 2008).  The economic loss rule applies in two circumstances:  (1) when the parties are in contractual privity and one party seeks to recover damages in tort for matters arising from the contract, and (2) when there is a defect in a product that causes damage to the product but no personal injury or damage.  *Id.* (citing *Indemnity Ins. Co. of N. Am. v. Am. Aviation, Inc.*, 891 So. 2d 532, 537 (Fla. 2004)).  One purpose of the rule "is to prevent parties to agreements from circumventing the allocation of losses set forth in the contract by bringing an action for economic loss in tort and thereby seeking to obtain a better bargain than they originally made."  *Id.* (internal marks omitted).  However, where there is conduct beyond the breach of contract that rises to the level of an independent tort, then the economic loss rule does not bar the tort claim.  *Kee v. Nat'l Reserve Life Ins. Co.*, 918 F.2d 1538, 1543 (11th Cir. 1990) (citing *Elec. Sec. Sys. Corp. v. S. Bell Tel. & Tel. Co.*, 482 So. 2d 518, 519 (Fla. 3d DCA 1986)).  JDI's tortious interference claim involves allegations of a secret dual agency and as such the claim presents additional conduct beyond the alleged breach of contract and thus the claim is not barred by the economic loss rule.  *See Gardner v. Construct Corps, LLC*, No. 8:09cv1743, 2010 WL 427742, at *2 (M.D. Fla. 2010) (recognizing tortious interference as a permissible exception to the economic loss rule).

"'[I]t is well established that an agent for one party to a transaction cannot act for the other party without the consent of both principals, and if the agent acts in a dual capacity without consent of both, "'the transaction is voidable as a matter of public policy.'"' *Lerer v. Arvida Realty Co.*, 134 So. 2d 798, 799 (Fla. 2d DCA 1961) (quoting *Taborsky v. Mathews*, 121 So. 2d 61, 62 (Fla. 2d DCA 1960) & citing 2 Am. Jur. Agency § 265). Also, where a third party interferes with the agent of another with knowledge that the agent is violating his obligations to the principal, the third party may be held jointly liable with the agent for the secret profits. *Martin Co. v. Commercial Chemists, Inc.*, 213 So. 2d 477, 480 (Fla. 4th DCA 1968), *cert. denied*, 225 So. 2d 523 (Fla. 1969). This joint liability applies unless the third party reasonably believes that the other principal acquiesced in the double employment. *Id.* Dual agency, therefore, is not prohibited as a matter of law as long as the principals are fully advised and consent. *Wolfe v. Aetna Ins. Co.*, 436 So. 2d 997, 1000 (Fla. 5th DCA 1983). However, to find a dual agency relationship, there must be evidence of control by the principal over the agent. S*ee Goldschmidt v. Holman*, 571 So. 2d 422, 424 n.5 (Fla. 1990); *State v. Am. Tobacco Co.*, 707 So.2d 851, 854 (Fla. 4th DCA 1988).

The court cannot conclude by a preponderance of the evidence at trial that Kerr was in fact acting as Jet's secret agent during the pre-purchase inspection process. Isaacman initially had assumed that the seller would pay Kerr's fee. According to Watkins, aircraft brokerage fees are structured in different ways, depending on the deal; sometimes the buyer pays and other times the commission fee is split between buyer and seller. Here, JDI's attorney, Dulac, instructed Kerr early in the process to first see what fee he could obtain from the seller before asking Isaacman for a commission, which is precisely what Kerr did. There is no evidence that Jet instructed Kerr to keep their fee arrangement a secret. Watkins explained at trial that the broker's fees are usually set forth in the aircraft purchase agreement but that Dulac rejected the idea of including Kerr's fee in the purchase agreement, indicating that Dulac was aware of the arrangement. Dulac's knowledge is appropriately imputed to Isaacman. *See generally*, *Anderson v. Walthal*, 468 So. 2d 291, 294 (Fla. 1st DCA 1985) (noting it is settled law that knowledge of an agent "while acting

within the course and scope of his employment, and when it is in reference to matters over which the agent's authority extends," is imputed to the principal).

JDI argues that the emails from Watkins, asking Kerr to hold off on showing the buyer (Isaacman) the December 16 discrepancy list, coupled with the fact that Isaacman did not receive the final December 28 list prior to closing, indicate that Jet exercised some measure of control over Kerr.  This is sheer speculation on JDI's part.  Isaacman signed the acceptance form on December 19, making the deposit nonrefundable, at the urging of his attorney, Dulac, not Kerr.  Isaacman additionally admitted that he saw the intermediate discrepancy list showing all of the problems with the airplane but said he did not see the final list noting that some items were deferred instead of repaired.  Watkins explained that his concern with the buyer seeing the December 16 list right away was merely that he knew some of the discrepancies could be cleared up first.  Watkins explained that some record-keeping and parts-tracking questions show up as discrepancies initially but can be eliminated after further clarification by the seller, who is more familiar with the aircraft's history and records.  Watkins simply wanted time to engage in that validation process prior to the buyer seeing all of the items listed.  Witnesses for both JDI and Jet with experience in the pre-purchase inspection process agreed that the validation of noted deficiencies is an ordinary and natural part of the process.  By asking Kerr to hold off on showing the December 16 report to Isaacman, Watkins was not thereby exercising control or influence over Kerr but doing his own job to monitor and correct the discrepancies for the seller.  The record thus fails to establish that Watkins intended to interfere with Kerr's agency with JDI by causing Kerr to fail to disclose the final report.

Kerr's commission from Jet was contingent only on the completion of the deal and the costs of airworthy repairs being less than $150,000 (what remained of that amount would go to Kerr).  Additionally, contrary to JDI's contention, there is no evidence that Jet used Kerr to minimize the repair costs.  Kerr had no contact with or influence over the Cessna service center mechanics' independent airworthiness determinations, and Kerr's recommendation that Isaacman forego an expensive Phase 1 - 5 inspection because the process had been performed a few months earlier was reasonable according to the trial

experts.  For instance, JDI's own expert, Garner, stated that he would have repeated the full inspection only if it had not been completed within the past 12 months, and JDI's expert MacConnel stated the Phase 1 - 4 is required every 24 months and the Phase 5 inspection every 36 months.  Here, Southern had completed the Phase 1 - 5 less than six months prior to the purchase agreement.  Chuck Farney from Cessna admitted that his suggestion of a new Phase 1 - 5 inspection was simply a routine recommendation.  Undoubtably, it is an expensive inspection that is good for Cessna's business.  Based on the evidence, the court is not persuaded that Jet used Kerr to minimize Jet's repair cost or that Jet otherwise interfered with Kerr's fiduciary obligation to his principal.  *See Martin Co.*, 213 So. 2d at 480.

Conspiracy

A civil conspiracy requires a showing of (1) an agreement between two or more parties; (2) to do an unlawful act, or a lawful act by unlawful means; (3) an overt act in pursuance of the conspiracy; and (4) damages.  *See Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1159-60 (Fla. 3d DCA 2008).  In this case, for the reasons previously given, the evidence fails to establish an agreement between Jet and Kerr to complete the aircraft purchase by intentionally concealing discrepancies from Isaacman or influencing Cessna to falsify the airworthiness discrepancy report.

Rescission

Rescission is a harsh remedy, typically disfavored by the courts.  *See Rood Co. v. Bd. of Pub. Instruction of Dade County*, 102 So. 2d 139, 142 (Fla. 1958).  Rescission may be appropriate, however, where there is evidence of fraud, mutual mistake, a false representation, or other ground for rescission; the party seeking to rescind has notified the other party of the rescission; and there is no adequate remedy at law.  *See Staaldam Beheer B.V. v. ASAP Installations, LLC*, No. 809cv2226, 2010 WL 1730780, at * 4 (M.D. Fla. April 28, 2010) (slip op.) (citing *Crown Ice Mach. Leasing Co. v. Sam Senter Farms, Inc.*, 174 So. 2d 614, 617 (Fla. 2d DCA 1965)).  The court finds no conduct on the part of Jet amounting to fraud or a false representation that would support rescission of the aircraft

purchase agreement, and in any event, an adequate remedy at law exists through a breach of contract claim and damages.

Breach of Fiduciary Duty

JDI asserts a breach of fiduciary duty by Kerr.  The elements of a claim for breach of fiduciary duty are: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damages.  *See Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002).  "'A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of that relation.'"  *Id.* at 354 (quoting Restatement (Second) of Torts, § 874 cmt. a).  A broker or agent owes a fiduciary duty of loyalty.  *See Frey v. Fraser Yachts*, 29 F.3d 1153, 1156 (7th Cir. 1994) (citing *Young v. Field*, 548 So. 2d 784, 786 (Fla. 4th DCA 1989)).  A broker or agent also owes a fiduciary duty of full disclosure.  *See Young*, 548 So.2d at 786.  Self-dealing is inconsistent with a broker's duty to a client.  *Phillips Chem. Co. v. Morgan*, 440 So. 2d 1292, 1294 (Fla. 3d DCA 1983).  Additionally, "[c]oncealment of material facts known to the broker will forfeit his right to compensation for his services."  *Kline v. PYMS Suchman Real Estate Co.*, 303 So. 2d 401, 405 (Fla. 3d DCA 1974), *cert. denied*, 314 So. 2d 588 (Fla. 1975).  The fiduciary duty of dealing honestly and with good faith is breached "where there is a showing of fraud, deceit or absence of good faith."  *Messer v. E.F. Hutton & Co.*, 833 F.2d 909, 920 (11th Cir. 1987) (citing Florida common law), *amended on reh'g on other grounds*, 847 F.2d 673 (11th Cir. 1988).  Thus, mere negligence is not sufficient to demonstrate a breach of fiduciary duty.  *See generally Maliner v. Wachovia Bank, N.A.*, No. 04-60237, 2005 WL 670293, at *9 (S.D. Fla. 2005) (noting more than mere negligence was required to recover for breach of fiduciary duty) (unpublished); *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 687 (Fla. 2004) (noting in an insurance context that breach of fiduciary requires demonstration of more than mere negligence).

JDI argues that Kerr breached his fiduciary duty as JDI's broker in this transaction by failing to disclose his fee agreement with Jet and failing to disclose material facts of deferred deficiencies in the aircraft in order to complete the transaction to his own financial gain.  The facts show that JDI's attorney, Dulac, told Kerr to seek a fee first from the seller,

and although Kerr did not directly disclose his agreement with Jet to Isaacman personally, he had been instructed to deal with Dulac and Watkins testified that it was Dulac who did not want the fee arrangement memorialized in the purchase agreement.  Because Dulac's knowledge of the arrangement is imputed to JDI, *see generally*, *Anderson*, 468 So. 2d at 294, Kerr's split fee arrangement was not secret.  In fact, according to Isaacman, he initially had understood that Kerr would receive a commission from the seller.[55]  The fact that Kerr's fee from Jet was contingent on the deal closing is unremarkable in this case. Common sense dictates that Kerr would not receive a commission from either party if the transaction was not completed.  After making his arrangement with the seller as Dulac had suggested, Kerr did not seek a fee from Isaacman until he saw his potential fee from Jet diminishing by half due to the rising cost of repairs.  Although Kerr then asked Isaacman for a large commission without mentioning his arrangement with Jet, the facts do not demonstrate he was engaged in bad faith or self-dealing.[56]  Kerr ended up receiving from Isaacman an amount that equaled one-half of the commission he initially requested of JDI, and he obtained the other half from Jet, in line with Dulac's suggestion to him.  The split fee arrangement in this case did not render Kerr a secret agent of Jet or compromise Kerr's loyalties to Isaacman, and there is no evidence that the fee arrangement caused Kerr to exert influence over mechanics contrary to Isaacman's interests.  Thus, there was no breach of loyalty from the split-fee arrangement and no resulting damages to JDI.

The allegation that Kerr failed to disclose the final discrepancy report from Cessna is more troubling.  There is no documentary evidence proving that Kerr or his office forwarded the final report to Dulac, and Isaacman testified that he might not have proceeded with the transaction had he seen the final discrepancy report showing 21 items

---

[55] Isaacman testified that he consulted Dulac when Kerr approached him for a fee because he had assumed the seller would pay.  Dulac told him it varies by transaction but that it was not like a real estate transaction where the seller always pays the agent.  Isaacman testified that he got the message at that point that the responsibility to pay a fee would fall on him, the buyer, in this situation.  There is no indication within the record that Dulac advised Isaacman at this time – or at any time – that he had earlier suggested to Kerr that he approach the seller first for his commission.

[56] Also, according to defense expert Scanlon, the purchase price negotiated for this aircraft was reasonable.

deferred instead of repaired.  However, rejecting the plane at closing on the basis of unrepaired non-airworthy items was not a viable contract option for Isaacman.[57] Additionally, it is undisputed that Dulac and Isaacman had the bill, which was part of the final report, and it was Kerr's custom, in the ordinary course of his business, to forward material to them.  Kerr believed the report had been sent to them and testified that they did not ask to see it nor did they mention they had not received it on the day of closing. Notably, Dulac, who did not testify at trial, allowed Isaacman to go ahead with the closing without seeing the final report; both Dulac and Isaacman knew the final report existed and had clearly seen the bill for the repairs.  Although Dulac and Isaacman said they did not see the report prior to closing but relied only on Kerr's representation that "all" had been fixed, Kerr understood that "all" meant all of the airworthy items.  The court finds this was a reasonable understanding, considering it was consistent with the language of the purchase agreement drafted by Dulac and the industry standard.[58]  Again, Isaacman's lack of understanding regarding Jet's obligation to make only airworthiness repairs permeated the relationship.

Importantly, the court has found that the plane was delivered in an airworthy condition.  Under the purchase agreement, Isaacman had no option to walk away from the deal at closing absent the existence of an outstanding airworthiness deficiency.  Kerr called Isaacman at closing to inform him of the bald nose tire he discovered, which was the one outstanding item of any airworthy concern on the plane and thus something that could have derailed the entire deal.  Thus, Kerr's act of reporting this defect demonstrates good faith on his part and is inconsistent with one trying to close the deal irrespective of Isaacman's best interests.  Also, even assuming Kerr failed to disclose the nonairworthy items which Jet had deferred, this does not amount to a material nondisclosure that would breach his

---

[57]  According to the purchase agreement, Isaacman could not have backed out without breaching the agreement unless the seller delivered the aircraft with an outstanding airworthy item, because he had signed the agreement, as well as the acceptance form making the deposit nonrefundable–again, which he signed at his attorney's request.

[58]  Michael's statement that he had never seen an agreement where the seller paid for all repairs further demonstrates that Kerr's interpretation was reasonable in the industry.

fiduciary duty because the contract only allowed Isaacman an "out" at closing for the existence of an airworthy discrepancy, and there is no evidence to demonstrate that Isaacman's misunderstanding or Kerr's alleged failure to fax the final report to him was born of anything more than negligence.  Such negligence does not rise to a breach of fiduciary duty.  *See Messer*, 833 F.2d at 920 (requiring a showing of fraud, deceit or absence of good faith).

Fraud

The essential elements of fraud under Florida law are (1) a false statement concerning a specific material fact; (2) the maker's knowledge that the representation is false; (3) an intention that the representation induce another's reliance; and (4) consequent injury to the party who acts in justifiable reliance on the representation.  *See Wadlington v. Continental Med. Servs., Inc.*, 907 So. 2d 631, 632 (Fla. 4th DCA 2005).  Without justifiable reliance, there can be no actionable fraud.  *See Hillcrest Pac. Corp. v. Yamamura*, 727 So. 2d 1053, 1057 (Fla. 4th DCA 1999).  Fraud may be based on either an intentional misrepresentation or an omission of material fact.  *See Ward v. Atl. Sec. Bank*, 777 So. 2d 1144, 1146 (Fla. 3d DCA 2001).  A failure to disclose calculated to induce a false belief violates principles of fair dealing and good faith.  *See Johnson v. Davis*, 480 So. 2d 625, 628 (Fla. 1985).  However, "a misrepresentation is not actionable where its truth might have been discovered by the exercise of ordinary diligence."  *David v. Davenport*, 656 So. 2d 952, 953 (Fla. 3d DCA 1995) (internal marks omitted).  Fraud is to be proven by a preponderance of the evidence in a civil action.  *See Beal Bank, SSB v. Almand and Assoc.*, 780 So. 2d 45, 58 n.19 (Fla. 2001).

The evidence outlined above demonstrates that any failure by Kerr to ensure that Isaacman saw the final discrepancy report as well as his assurances that the plane was "perfect" were not made with an intent to defraud or purpose to deceive.  Kerr testified that his ordinary practice was to forward all documents to Isaacman and Dulac as a matter of course.  He had instructed his assistant Mary Scales to follow this practice and he believed she had, though she could not specifically recall faxing the final report.  Isaacman was aware that there would be a final report and, "in the exercise of ordinary diligence," could

have insisted on seeing it prior to closing.  *See David*, 656 So. 2d at 953.  Also, Kerr's assurance that all was going smoothly through the validation process was truthful – Jet was validating and authorizing airworthy repairs, *as required by the contract*.  This was to Isaacman's benefit, even though it was not in Kerr's personal interest because it diminished his fee from Jet.

Unjust Enrichment

"A claim for unjust enrichment seeks restitution from a party allegedly unjustly enriched" at another's expense.  *Ala v. Chesser*, 5 So. 3d 715, 718 (Fla. 1st DCA 2009) (citing Restatement of Restitution § 1, at 12 (1937)).  The elements are (1) that the plaintiff conferred a benefit on the defendant, who has knowledge of it; (2) that the defendant voluntarily accepted and retained the benefit; and (3) circumstances exist showing it would be inequitable for the defendant to retain the benefit without paying the plaintiff its value.  *See Extraordinary Title Servs., LLC v. Fla. Power & Light Co.*, 1 So. 3d 400, 404 (Fla. 3d DCA 2009).  Kerr knowingly accepted a broker's fee from JDI; however, because the circumstances demonstrate that he performed valuable services, Kerr was not unjustly enriched by the payment.  JDI received an aircraft in airworthy condition upon delivery in conformance with the contract, and Kerr performed services in aid of JDI's purchase by helping to locate the aircraft, aiding in the negotiation of the transaction, and attending the closing.  JDI did not enter into a written agreement with Kerr explicitly setting forth the duties or obligations of either party, and the court concludes that the misunderstanding that ensued was attributable not only to Kerr but also to Isaacman's own lack of diligence as well as to the conduct of Isaacman's agent, Dulac, whose knowledge must be imputed to Isaacman.  The court concludes there was no unjust enrichment.

Florida Deceptive and Unfair Trade Practices Act

JDI asserts that Jet and Kerr engaged in deceptive and unfair trade practices in violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), which declares unlawful any "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.204.  FDUTPA "applies to private causes of action arising from single unfair or

deceptive acts in the conduct of any trade or commerce, even if it involves only a single party, a single transaction, or a single contract." *See PNR, Inc. v. Beacon Property Mgm't, Inc.*, 842 So. 2d 773, 777 (Fla. 2003).  Unfair and deceptive trade practices are not defined by the legislature, but Florida courts have held that a practice is unfair if it "offends established public policy, is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Id.*  FDUTPA is a separate cause of action intended to be an additional remedy, *see* Fla. Stat. § 501.213(1), and it is aimed toward making consumers whole for losses caused by fraudulent consumer practices. *Delgado v. J.W. Courtesy Pontiac GMC-Truck, Inc.*, 693 So. 2d 602, 606 & 610 (Fla. 2d DCA 1997).  Because the court has concluded that neither Jet nor Kerr engaged in a deceptive or fraudulent practice, this claim fails. *See Witt v. La Gorce Country Club, Inc.*,35 So. 3d 1033, 1040 (Fla. 3d DCA 2010) (explaining that whether conduct constitutes an unfair or deceptive trade practice is a question of fact and affirming a finding of no deceptive trade practice where there was no misrepresentation or deceptive non-disclosure).

**Conclusion**

The evidence at trial demonstrates that a major misunderstanding developed early in this transaction between Isaacman, his lawyer Dulac, and Kerr about Isaacman's wishes to negotiate a deal where the seller would pay for every discrepancy on the aircraft needing repair, not simply those relating to airworthiness.  It is clear that Isaacman did not get what he wanted, i.e., a perfect plane.  It is equally clear, however, that he did get what he bargained for, i.e., an airworthy plane.  The miscommunication does not appear to have been born of fraud, and Dulac's knowledge of Kerr's fee arrangement is properly imputed to JDI.  Without expressing any opinion on whether Kerr provided competent aircraft brokerage services to Isaacman, the court concludes there was no conscious intent to mislead, no lack of good faith, and consequently, no breach of fiduciary duty.

Accordingly, based upon the law and the evidence presented at trial and duly considered by the court, and in the case of Southern for the reasons stated by the court at trial, it is hereby ordered that final judgment shall be entered in favor of all Defendants

and against Plaintiff, with costs taxed against Plaintiff.

**DONE and ORDERED** this 6th day of August, 2010.

s/ *M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**